EXXON CORPORATION, Plaintiff-
Appellant,

v.

The CITY OF NEW YORK et al.,
Defendants-Appellees.

GETTY OIL CO. (EASTERN OPERA-
TIONS), INC., et al., Plaintiffs-
Appellants,

v.

The CITY OF NEW YORK et al.,
Defendants-Appellees.

Nos. 916, 927, Dockets 73–1481, 73–1497.

United States Court of Appeals,
Second Circuit.

Argued May 9, 1973.

Decided May 17, 1973.

Joseph T. McLaughlin, New York City
(Shearman & Sterling, New York City,
Robert L. Clare, Jr., George J. Wade and
Kent Sinclair, Jr., New York City, of
counsel), for plaintiff-appellant, Exxon
Corp.

Miles F. McDonald, New York City
(Shea Gould, Climenko & Kramer, Jesse
Climenko and Robert Gold, New York
City, of counsel), for plaintiffs-appel-
lants, Getty Oil Co. (Eastern Opera-
tions), Inc., Gulf Oil Co.—U. S. Mobile
Oil Corp., and Sun Oil Co. of Pa.

Evan A. Davis, New York City (Nor-
man Redlich, Corp. Counsel, Evelyn J.
Junge and Alexander Gigante, Jr., New
York City, of counsel), for defendants-
appellees.

David Schoenbrod, New York City for
amici curiae, Natural Resources Defense
Council, Inc., Citizens Committee to End
Lead Poisoning, NYC Clean Air Cam-
paign and Uniformed Bridge and Tun-
nel Officers, Local 1396, AGSCME.

Before MULLIGAN and TIMBERS,
Circuit Judges, and JAMESON, District
Judge.*

* United States District Judge, District of Montana, sitting by designation.

MULLIGAN, Circuit Judge:

Plaintiff Exxon Corporation commenced an action on March 9, 1973 and plaintiffs Getty Oil Co., Gulf Oil Co., Mobil Oil Corporation and Sun Oil Company instituted another action on March 14, 1973, seeking declaratory and injunctive relief against the enforcement of Sections 1403.2–13.11 and 13.12 [1] of the Administrative Code of the City of New York which prescribe the maximum lead content and volatility limits of regular and premium grade gasoline sold in the City of New York. The actions were consolidated on March 15, 1973 when all of the plaintiffs sought a preliminary injunction which would prevent the defendants from enforcing Section 1403.2–13.11(a)(3) & (4) of the Administrative Code of the City of New York from imposing fines or penalties under Section 1403.2–15.25(d) thereof or from barring or attempting to bar the purchase, sale, offer for sale, storage or transportation of plaintiffs' gasoline, intended for use in the City of New York, because of noncompliance with the provisions of the Administrative Code. By order dated March 22, 1973 Hon. Charles E. Stewart, Jr., United States District Judge, Southern District of New York, denied the plaintiffs' motions for a preliminary injunction. Plaintiffs sought a stay pending appeal which was granted for a limited period by the District Court on March 26, 1973; that stay was extended by this Court on April 10, 1973 pending the expedited appeal granted to the parties from the order of Judge Stewart denying the preliminary injunction. We now hold that the stay ordered by Judge Stewart on March 26, 1973 and later extended by this Court should be further extended, conditioned upon the appellants' readiness to go to trial within 30 days pursuant to this opinion.

Section 1403.2–13.11 of the Administrative Code of the City of New York

---

1. The Exxon action seeks relief from the lead restriction section of the Administrative Code Section 1403.2–13.11, while the Getty, Gulf, Mobil and Sun action seeks relief from that provision and the volatility restrictions of Section 1403.2–13.12.

Section 1403.2–13.11 provides:

Lead content of gasoline restricted.—(a) No person shall cause or permit the use, or, if intended for use in the city of New York, the purchase, sale, offer for sale, storage or transportation of gasoline which contains more than the following amount of lead by weight for the respective octane ranges as follows:

| | 95.9 Octane No.* & Above | Below 95.9 Octane No.* |
|---|---|---|
| (1) On and after November 1, 1971 | 2.0 grams per gal. | 1.5 grams per gal. |
| (2) On and after January 1, 1972 | 1.0 grams per gal. | 1.0 grams per gal. |
| (3) On and after January 1, 1973 | 0.5 grams per gal. | 0.5 grams per gal. |
| (4) On and after January 1, 1974 | zero grams | zero grams |

\* The term octane number shall mean research octane number or rating measured by the research method.

(b) Where the lead content of gasoline is restricted to zero grams per gallon as in sub-section a, gasoline which contains 0.075 grams of lead per gallon shall be deemed to meet such restriction.

Section 1403.2–13.12 provides:

Volatility limits on gasoline.—Effective October 1, 1971, no person shall cause or permit the use, or, if intended for use in the city of New York, the purchase, sale, offer for sale, storage or transportation of gasoline which exceeds the following volatility limits:

(a) For the period October 1, through April 30, not to exceed 12 Reid vapor pressure.

(b) For the period May 1 through September 30, not to exceed 7 Reid vapor pressure.

provides for the gradual reduction of the lead content of gasoline to be sold in New York City over a four year period, from 2.0 grams per gallon in 1971 (premium fuel), to .5 grams per gallon by January 1, 1973 (premium and regular fuel) and to zero grams by January 1, 1974. Enforcement of the January 1, 1973 standard was suspended by the City Administrator until March 30, 1973 for regular gasoline and until June 28, 1973 for premium gasoline.

The Administrator of the Federal Environmental Protection Agency has by regulation, effective January 9, 1973, established a nation-wide control over lead in gasoline requiring that at least one grade of gasoline with a lead content of not more than .05 gram per gallon be generally available throughout the United States by July 1, 1974. 40 C.F.R. §§ 80.1–.24 (1973).[2] It is urged that by taking this action the United States, pursuant to § 211(c)(4) of the Clean Air Act, 42 U.S.C. § 1857f–6c(c)(4),[3] has preempted any non-identical regulatory action by the defendants here, thus rendering the pertinent sections of the City's Administrative Code null and void under the Supremacy Clause of the Constitution of the United States. The defendants respond that the Administrator may regulate the use of fuel additives if they are found harmful to public health

2. The pertinent portions of these regulations are:

§ 80.22 Controls applicable to gasoline retailers.

. . . . .

(b) After July 1, 1974, every person who owns, leases, operates, controls, or supervises a retail outlet at which 200,-000 or more gallons of gasoline was sold during any calendar year beginning with the year 1971 shall offer for sale at least one grade of unleaded gasoline of not less than 91 Research Octane Number at such retail outlet: *Provided, however,* That the octane number of unleaded gasoline offered for sale in areas where altitude is greater than 2,000 feet may be reduced one (1) octane number for each succeeding 1,000 feet but not more than three (3) octane numbers in total.

(c) After July 1, 1974, every person who owns, leases, operates, controls, or supervises six or more retail outlets shall offer for sale at least one grade of unleaded gasoline of not less than 91 Research Octane Number at no fewer than 60 percent of such outlets; *Provided, however,* That the octane number of unleaded gasoline offered for sale in areas where altitude is greater than 2,000 feet may be reduced one (1) octane number for each succeeding 1,000 feet but not more than three (3) octane numbers in total.

Section 80.2(g) defines "unleaded gasoline" as "gasoline containing not more than 0.05 gram of lead per gallon and not more than 0.005 gram of phosphorus per gallon."

3. 42 U.S.C. § 1857f–6c(c)(4) provides:

(A) Except as otherwise provided in subparagraph (B) or (C), no State (or political subdivision thereof) may prescribe or attempt to enforce, for purposes of motor vehicle emission control, any control or prohibition respecting use of a fuel or fuel additive in a motor vehicle or motor vehicle engine—

(i) if the Administrator has found that no control or prohibition under paragraph (1) is necessary and has published his finding in the Federal Register, or

(ii) if the Administrator has prescribed under paragraph (1) a control or prohibition applicable to such fuel or fuel additive, unless State prohibition or control is identical to the prohibition or control prescribed by the Administrator.

(B) Any State for which application of section 1857f–6a(a) of this title has at any time been waived under section 1857f–6a(b) of this title may at any time prescribe and enforce, for the purpose of motor vehicle emission control, a control or prohibition respecting any fuel or fuel additive.

(C) A State may prescribe and enforce, for purposes of motor vehicle emission control, a control or prohibition respecting the use of a fuel or fuel additive in a motor vehicle or motor vehicle engine if an applicable implementation plan for such State under section 1857c–5 of this title so provides. The Administrator may approve such provision in an implementation plan, or promulgate an implementation plan containing such a provision, only if he finds that the State control or prohibition is necessary to achieve the national primary or secondary ambient air quality standard which the plan implements.

in themselves *or* if they significantly impair the performance of motor vehicle emission control devices. 42 U.S.C. § 1857f–6c(c)(1). Since the Administrator's regulation is only aimed at protecting the efficiency of emission control devices, they claim that local municipalities are still free to enforce regulations to protect public health.[4]

Plaintiffs also attack the City regulations as imposing substantial burdens on interstate commerce in violation of the Commerce Clause of the Federal Constitution. Southern Pacific Co. v. Arizona, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). In substance the plaintiffs claim that in order to provide gasoline with lower lead levels while maintaining current octane levels, they will be forced to expand vast sums to produce and distribute gasoline for use in New York City. Their normal manufacturing and distribution systems are geared to supply the Northeastern States generally and the segregation and transmission of a separate fuel limited to use in New York City, will allegedly disrupt current practices. Exxon estimates an initial expense of $100,000 with future expenses predicted at $500,000 per annum. The other four plaintiffs estimate added costs of $8,000,000 which are not fully compensable nor are the changes readily reversible. Separate refinery facilities will have to be provided and additional processes applied to subject crude oil to greater refinement or "aromatics" will have to be added, all of which it is alleged will add expense and result in a corresponding increase in prices to the consumer as well as a diminution in the supply of crude oil in a period of fuel shortages. Pipe line transmission in some cases will have to be abandoned and tanker transport substituted. Delivery to central distribution points now serving a broad market, will have to be rearranged or relocated.

In determining whether or not a preliminary injunction should be granted, Judge Stewart held that the plaintiffs must show a strong likelihood of ultimate success on the merits plus irreparable damage if the relief sought is not granted. E. g., Intercontinental Container Transport Corp. v. New York Shipping Ass'n, 426 F.2d 884 (2d Cir. 1970). Applying this norm and "weighing the equities" he concluded that on the record before him he could not find that the burden on interstate commerce is likely to be clearly excessive in relation to the benefits which the regulation would bestow upon the population of a high traffic area such as New York City's. Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). After making this determination the court proceeded to state: "Nevertheless, plaintiffs have raised

---

4. The regulations promulgated so far (40 C.F.R. §§ 80.1–.24, in 38 Fed.Reg. 1254–56 (Jan. 10, 1973)) are based solely "upon a determination by the Administrator that the emission product of a fuel or additive will impair to a significant degree the performance of a motor vehicle emission control device . . . ." 40 C.F.R. § 80.1. The Administrator has proposed regulations based upon the effect of lead on public health. Notice of Proposed Rule Making, 38 Fed.Reg. 1258–61 (Jan. 10, 1973). Proposed Regulation § 80.20(a)(1) provides:

§ 80.20 Controls applicable to gasoline refiners.

(a)(1) In the manufacture of leaded gasoline at any refinery, no gasoline refiners shall exceed the average lead content per gallon specified below for each 3-month period (January through March, April through June, July through September, October through December):

(i) 2.0 grams of lead per gallon, after January 1, 1975;

(ii) 1.7 grams of lead per gallon, after January 1, 1976;

(iii) 1.5 grams of lead per gallon, after January 1, 1977;

(iv) 1.25 grams of lead per gallon, after January 1, 1978.

New York's Implementation Plan (42 U.S.C. §§ 1857c–5, 1857f–6c(c)(4)(C)) has not yet received federal approval. The original draft of the Plan for the Metropolitan Area did not include the City's lead restrictions, though the City subsequently proposed that the continued enforcement of Section 1403.2–13.11(a) (3) be made a part of the Plan.

substantial issues in this regard which may necessitate further inquiry as this case proceeds to a final determination on the merits." He further found no federal preemption.

Appellants argue that in a case where the balance of hardships tips decidedly in favor of the party requesting relief, a preliminary injunction should issue where that party has raised "questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for more deliberate investigation." Gulf & Western Industries, Inc. v. Great Atl. & Pac. Tea Co., 476 F.2d 687, 692 (2d Cir. 1973) (emphasis deleted), quoting from Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). Since Judge Stewart found that substantial, litigable issues were raised, it is urged that the "strong likelihood of ultimate success on the merits" test he employed was inappropriate since the equities are tipped heavily in favor of the plaintiffs. The defendants do not dispute the appellants' statement of the law with respect to preliminary injunctions but maintain that in fact the balance of hardships tips highly in favor of the City of New York.

■■■■ Since Judge Stewart did not apply the criterion concededly appropriate in view of his finding that a substantial litigable issue on the merits existed, he did not address himself to the question of "hardship tipping" except to state that he had balanced the equities without further explication. While we do have the power to reverse the lower court's denial or grant of preliminary injunctive relief where there is an abuse of discretion or a clear mistake of law, Dino DeLaurentiis Cinematografica, S.p.A. v. D–150, Inc., 366 F.2d 373 (2d Cir. 1966); see 7 J. Moore, Federal Practice ¶ 65.04[1], at 65–35 to 65–36 (2d ed. 1972), and this would be appropriate particularly in a case where the preliminary injunction is sought simply to maintain the *status quo* pending a full hearing on the merits, 7 J. Moore, Fed-

eral Practice ¶ 65.04[1] (2d ed. 1972), we do not believe that course is appropriate here. The hardship to be suffered by the plaintiffs necessarily involves questions relevant to the issue of the burden on interstate commerce, which is difficult to ascertain absent an evidentiary hearing as indicated below. At the same time while we fully appreciate the concern of the City for the health of its citizens plagued with foul air which the defendants maintain is partially due to excessive lead particulate concentrations not only in areas of high traffic concentration but throughout the metropolitan area, we are not persuaded that reversal for further consideration of preliminary injunctive relief and assessment of "hardship tipping" will expedite the solution of an issue in which the parties maintain there are substantial questions of economic injury and public health involved.

In his order of March 26, 1973 granting the stay pending appeal, Judge Stewart found that enforcement of the Administrative Code would cause hardship to the plaintiffs and that a stay until April 15th (later extended by this Court) would not cause substantial harm. In our view we believe that no substantial harm and in fact expedition of the resolution of vexing issues would be accomplished if that stay is extended on condition that the appellants be ready for trial within 30 days from the filing of this opinion and that the trial proceed promptly thereafter. We recognize that the calendar of the Southern District is congested and that Judge Stewart who has been assigned to this case for all purposes and who is familiar with the facts and legal issues involved, may not be able to give this matter priority. If he should not be able to hear this case with the promptness that we have indicated it deserves, then we would request the Chief Judge of the Southern District Court to assign the matter to another trial judge who would be available for a prompt trial. The mandate shall issue forthwith and no costs are awarded. In view of this disposition of the case, we do not reach the preemption question.