**EXXON CORPORATION, Plaintiff,**

v.

**The CITY OF NEW YORK et al.,**
**Defendants.**

**GETTY OIL CO. (Eastern Operations),**
**INC., et al., Plaintiffs,**

v.

**The CITY OF NEW YORK et al.,**
**Defendants.**

**Nos. Civ. 1047, 1093.**

United States District Court,
S. D. New York.

March 8, 1974.

Shearman & Sterling, New York City, for plaintiff Exxon Corp.

Shea, Gould, Climenko & Kramer, New York City, for plaintiffs Getty Oil Co., Mobil Oil Corp. and Sun Oil Co. of Pa.

Adrian P. Burke, Corp. Counsel, New York City, for defendants.

## MEMORANDUM

STEWART, District Judge:

Plaintiffs have moved for a summary judgment on the ground that the Federal Regulation of Fuels and Fuel Additives, 38 Fed.Reg. 33734 (Dec. 6, 1973) (hereinafter Dec. 6, 1973 Regulations) has preempted Sections 1403.2–13.11 and 1403.2–13.12 of the Administrative Code of the City, which prescribe the maximum lead content and volatility limits of regular and premium grade gasoline sold in New York City. The Dec. 6, 1973 Regulations, promulgated by the Administrator for the Federal Environmental Protection Agency (FEPA) (hereinafter Federal Administrator) pursuant to 42 U.S.C. § 1857f–6c(c)(1)(A), set certain national limitations on the lead content in gasoline as of January 1, 1975. Whether the Dec. 6, 1973 Regulations presently preempt Sections 1403.2–13.11 and 1403.2–13.12 is the question presented by plaintiffs' motion. By stipulation of the parties the Exxon (73 Civ. 1047) and the Getty et al. (73 Civ. 1093) cases have been consolidated for all purposes.

*Background.*

On March 15, 1973 a hearing was held on plaintiffs' application for preliminary relief to declare Sections 1403.2–13.11 and 1403.2–13.12 null and void because they had been preempted by the promulgation of the January 10, 1973 federal regulations, and because they violated the commerce clause of the Constitution by discriminating against interstate commerce and by imposing extensive and unreasonable burdens on interstate commerce. By opinion and order of this Court of March 22, 1973 plaintiffs' application was denied. 356 F.Supp. 660.

On March 26, 1973 this Court granted plaintiffs' application for a stay pending appeal and extended the stay on April 10, 1973. Without reaching the merits the Court of Appeals extended the stay conditioned upon the appellants' readiness to go to trial within 30 days of the filing of its opinion of May 17, 1973.[1] This case has been dormant since then because both parties expected action by either the State Environmental Administrator or the Federal Administrator to be forthcoming. In the meantime, we understand that the plaintiffs have been complying with the second step of the City's ordinance which requires that on and after January 1, 1972 the lead content for gasoline of all Octane levels be 1.0 grams per gallon. The City has continued to allow compliance at the 1972 reduction level.

1. *See* Exxon Corp. v. City of New York and Getty Oil Co. v. City of New York, 480 F.2d 460 (2d Cir. 1973).

*Relevant Statutes.*

§§ 1403.2–13.11 and 1403.2–13.12 of the local ordinance provide that the lead content and other physical characteristics of gasoline 'sold in New York City comply with certain specifications.[2]

By the 1970 Amendments to the Clean Air Act Congress gave the Federal Administrator the power to set standards either for the purpose of protecting automobile pollution control devices or for the purpose of protecting the public health and welfare. *See* 42 U.S.C. § 1857f–6c(c)(1)(A) and (B).[3]

Section 211(c)(1)(A) of the Clean Air Act, as amended, 42 U.S.C. § 1857f–6c, provides for federal preemption of standards for fuel or fuel additives when the Administrator of the Federal Environmental Protection Agency has prescribed standards or has found that no control is necessary.[4] 42 U.S.C. §

2. § 1403.2–13.11 of the New York City Administrative Code provides for the following:

"Lead content of gasoline restricted.— (a) No person shall cause or permit the use, or if intended for use in the city of New York, the purchase, sale, offer for sale, storage or transportation of gasoline which contains more than the following amount of lead by weight for the respective octane ranges as follows:

|  | 95.9 Octane No. * & Above | Below 95.9 Octane No. * |
|---|---|---|
| (1) On and after November 1, 1971 | 2.0 grams per gal. | 1.5 grams per gal. |
| (2) On and after January 1, 1972 | 1.0 grams per gal. | 1.0 grams per gal. |
| (3) On and after January 1, 1973 | 0.5 grams per gal. | 0.5 grams per gal. |
| (4) On and after January 1, 1974 | zero grams | zero grams |

\* The term octane number shall mean research octane number or rating measured by, the research method.

(b) Where the lead content of gasoline is restricted to zero grams per gallon as in sub-section a, gasoline which contains 0.075 grams of lead per gallon shall be deemed to meet such restriction."

§ 1403.2–13.12 provides as follows:

"Volatility limits on gasoline.—Effective October 1, 1971, no person shall cause or permit the use, or, if intended for use in the city of New York, the purchase, sale, offer for sale, storage or transportation of gasoline which exceeds the following volatility limits:

(a) For the period October 1, through April 30, not to exceed 12 Reid vapor pressure.

(b) For the period May 1 through September 30, not to exceed 7 Reid vapor pressure."

———◆———

3. 42 U.S.C. § 1857f–6c(c)(1)(A) and (B) provide:

The Administrator may, from time to time on the basis of information obtain under subsection (b) of this section or other information available to him, by regulation, control or prohibit the manufacture, introduction into commerce, offering for sale, or sale of any fuel or fuel additive for use in a motor vehicle or motor vehicle engine (A) if any emission products of such fuel or fuel additive will endanger the public health or welfare, or

(B) if emission products of such fuel or fuel additive will impair to a significant degree the performance of any emission control device or system which is in general use, or which the Administrator finds has been developed to a point where in a reasonable time it would be in general use were such regulation to be promulgated.

4. 42 U.S.C. § 1857f–6c(c)(4)(A)(i) and (ii) provide:

Except as otherwise provided in subparagraph (B) or (C), no state (or political

1857f–6c(c)(4)(A)(i) bars local controls "if the Administrator has found that no control or prohibition . . . is necessary and has published his finding in the Federal Register." Since the Administrator has found otherwise, plaintiffs do not rely on this section for their preemption argument. 42 U.S.C. § 1857–6c(c)(4)(A)(ii) provides for preemption "if the Administrator has prescribed under paragraph (1) a control or prohibition applicable to such fuel or fuel additive, unless State prohibition or control is identical to the prohibition or control prescribed by the Administrator."

*Regulations.*

The first regulations promulgated pursuant to § 1857f–6c(c)(1)(A) and (B) (January 10, 1973) implemented a lead control standard needed to protect automobile emission control devices.[5] On December 6, 1973 the Federal Administrator promulgated an amendment to Part 80, Chapter I, Title 40 of Federal Regulations. *See* Fed.Reg. 33734–41. These regulations, which set standards from the standpoint of protection of health, became effective January 7, 1974 and generally establish prospective con-

trols applicable as of January 1, 1975. The controls require the lead content of gasoline be 1.7 gram per gallon after January 1, 1975 to 0.5 gram per gallon after January 1, 1979.

*Discussion.*

To allow the degradation of the city's air by use of the federal preemption doctrine, when the applicability of that principle in this case is doubtful at best, would be a travesty on the people of New York City. Plaintiffs seek to create a hiatus in the effective control of air quality in New York City in contravention of logic, legal principles and legislative intent. This Court concludes, based upon the following, that the Dec. 6, 1973 Regulations do not preempt sections 1403.2–13.11 and 1403.2–13.12 until January 1, 1975.

While this Court does not pretend to have any independent power to dictate the lead content of gasoline in New York City, it will not approve the dissolution of an otherwise valid local ordinance when no present conflict exists between it and federal standards. As noted above, 42 U.S.C. § 1857f–6c(c)(1) gives FEPA the power to "control or

---

subdivision thereof) may prescribe or attempt to enforce, for purposes of motor vehicle emission control, any control or prohibition respecting use of a fuel or fuel additive in a motor vehicle or motor vehicle engine—

    (i) if the Administrator has found that no control or prohibition under paragraph (1) is necessary and has published his findings in the Federal Register, or

    (ii) if the Administrator has prescribed under paragraph (1) a control or prohibition applicable to such fuel or fuel additive, unless State prohibition or control is identical to the prohibition or control prescribed by the Administrator.

5. *See* 40 C.F.R. § 80.1–.24, 38 Fed.Reg. 1254–56 (January 10, 1973).

    40 C.F.R. § 80.22 controls are applicable to gasoline retailers and provides: (b) After July 1, 1974, every person who owns, leases, operates, controls, or supervises a retail outlet at which 200,000 or more gallons of gasoline was sold during any calendar year beginning with the year 1971 shall offer for sale at least one

grade of unleaded gasoline of not less than 91 Research Octane Number at such retail outlet; Provided, however, that the octane number of unleaded gasoline offered for sale in areas where altitude is greater than 2,000 feet may be reduced one (1) octane number for each succeeding 1,000 feet but not more than three (3) octane numbers in total.

    (c) After July 1, 1974 every person who owns, leases, operates, controls, or supervises six or more retail outlets shall offer for sale at least one grade of unleaded gasoline of not less than 91 Research Octane Number at no fewer than 60 percent of such outlet; Provided, however, that the octane number of unleaded gasoline offered for sale in areas where altitude is greater than 2,000 feet may be reduced one (1) octane number for each succeeding 1,000 feet but not more than three (3) octane numbers in total.

    Section 80.2(g) defines "unleaded gasoline" as "gasoline containing not more than 0.05 gram of lead per gallon and not more than 0.005 gram of Phosphorus per gallon."

prohibit the manufacture, introduction into commerce, offering for sale, or sale of any fuel or fuel additive." Congress also provided that no state or subdivision thereof could enforce an emission control prescription not identical with the Federal Administrator's prohibition "applicable to such fuel or fuel additive . . ." 42 U.S.C. § 1857f–6c(c)(4)(A). Although the Dec. 6, 1973 Regulations as to lead content in gasoline are presently "effective", no control of lead content in gasoline is applicable until January 1, 1975. The defendant argues that it is only the existence of an applicable control that triggers preemption.

■ Defendant argues that because the Federal Administrator has chosen to begin the phased reduction of lead content in gasoline on January 1, 1975 does not mean that he determined that no controls are necessary until that time.[6] Defendant further argues that there is nothing in the Act which prohibits the City from continuing to protect its citizens until federal regulatory controls commence.[7] Plaintiffs correctly argue that the lead content reduction schedule set forth in the Dec. 6, 1973 Regulations is set up to moderate the economic and technological impacts of the regulations. But the plaintiffs have already been complying with the standards required by the City's ordinance. The fact that low-lead gasoline is already being provided in New York City is significant in light of the purpose of the Act. The first purpose of the Act is: "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 1857(b)(1)(1970). Since the city ordinance has been in effect, New York City has made significant progress in improving the quality of its air. To allow New York City's air to be degraded now would violate the very purpose of the Clean Air Act.[8] The interpretation of the Act must be consistent with its purpose which "is based in important part on a policy of non-degradation of existing clean air." Sierra Club v. Ruckelshaus, 344 F.Supp. 253 (D.D.C.1972), aff'd by an equally divided Court sub nom; Fri v. Sierra Club, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973).

Congress provided that the Federal Administrator would promulgate regulations for fuel additives if he found that the emission products will endanger the public health and welfare. The regulations specifically found such and assert that,

> "The scheduled reduction in the use of lead additives in gasoline to achieve a significant reduction in lead emissions from motor vehicles by 1978 is based on the finding that lead particle emissions from motor vehicles present a significant risk of harm to health of

---

6. The regulations address lead pollution as a present problem.
  "The resulting new health position paper concluded that airborne lead can either be directly absorbed through the lungs as people breathe, or can settle out of the air to contaminate dirt which may be consumed by children. Strong evidence existed which supported the view that through these routes airborne lead contributes to excessive lead exposure in urban adults and children. In light of this evidence of health risks, the Administrator concluded that it would be prudent to reduce preventable lead exposure . . . . Environmental lead exposure is a major health problem in this country. . . . Lead from gasoline accounts for approximately 90 percent of airborne lead." 38 Fed.Reg. at 33734.

7. Cf., e. g., Monongahela Connecting R. Co. v. Pennsylvania Pub. U. Comm., 373 F.2d 142, 148–149 (3rd Cir. 1967).

8. The Senate report on the Clean Air Act Amendment of 1970 states the following: "In areas where current air pollution levels are already equal to, or better than, the air quality goals, the [Administrator] should not approve any implementation plan which does not provide, to the maximum extent practicable, for the continued maintenance of such ambient air quality." S.Rep.No.1196, 91st Cong., 2d Sess. 11 (1970). If implementation plans which fail to maintain the existing level of air quality are so frowned upon, this Court deems it improper to cause the degrading of New York City's air quality by a broad application of the preemption doctrine.

urban population, particularly to the health of city children." 38 Fed.Reg. 33734.

Plaintiffs' argument that the Dec. 6, 1973 Regulations were intended to presently invalidate the City's ordinance is not consistent with such a finding. Indeed plaintiffs' arguments are not even supported by the December 6, 1973 Regulation itself which states that "[T]he low-lead regulations will not go into effect until 1975 . . ." *See* 38 Fed. Reg. 33739 Dec. 6, 1973.[9]

■■ Therefore, in view of the facts before this Court, the application of the preemption doctrine in this case would be contrary to the Second Circuit's general rule that the preemptive effect of a federal act must be narrowly construed when the exercise of local police power serves the purposes of the federal act. *See* Chrysler Corp. v. Tofany, 419 F.2d 499 (2d Cir. 1969). Not only has New York City's lead regulations been found to serve the purpose of the Clean Air Act,[10] but also nowhere in the statutory scheme can there be found Congressional intent to preempt the field of lead re-

duction for gasoline prior to actual federal control.[11] Thus plaintiffs have failed to show that there is an inevitable collision between the two schemes of regulation before January 1, 1975.[12] Indeed, the legislative history of the Clean Air Act demonstrates concern that state and local standards provide some measure of control of air pollution until such time as federal controls become applicable.[13]

The preceding conclusions apply as well to New York City Administrative Code § 1403.2–13.12 which controls the volatility content of gasoline. Federal regulations presently do not control volatility standards. In fact, the federal controls are relevant to lead content in gasoline only. The federal regulations do not deal with volatility which is controlled in a manner unrelated to the control of the lead content of gasoline. *See* affidavit of William Shapiro, Assistant to the New York City Commissioner of Air Resources. There is no basis for a conclusion that the regulations promulgated in the Federal Register for December 6, 1973 by FEPA have preempted the City's volatility ordinance.

9. These regulations were "effective" as of Jan. 7, 1974. *See* 38 Fed.Reg. 33741. However, the above quoted passage clearly demonstrates that the word "effective" is an administrative term of art relating to publishing regulations, comment time, notice, etc. For purposes of federal preemption such a term of art cannot be used to create a conflict between federal and state regulation until one actually exists. The regulations themselves declare that 1975 is that date.

10. *See* Allway Taxi Inc. v. City of New York, 340 F.Supp. 1120 (S.D.N.Y.1972).

11. In fact, Congressional judgment has consistently affirmed the importance of state and local control of air pollution ever since Congress first entered the field. "[T]he prevention and control of air pollution at its source is the primary responsibility of States and local governments" and is best implemented at that level. Clean Air Act § 101(a)(3), 42 U.S.C. § 1857(a)(3) (1970).

12. *See* Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).

13. The purpose behind the 1970 Amendments giving the federal government more control

was not to cause or allow the degradation of the air. Secretary of HEW, Robert Finch, testified that:

"One of the express purposes of the Clean Air Act is 'to protect and enhance the quality of the Nation's air resources'. It will continue to be our view that implementation plans that would permit significant deterioration of air quality in any area would be in conflict with the provisions of the Act. We do not intend to condone 'backsliding'. If an area has air quality which is better than the national standard, they would be required to stay there and not pollute the air even further, even though they may be below national standards."

Hearings on 5.3229, S. 466, S. 354b. Before the Subcomm. on Air and Water Pollution of the Senate Comm. on Public Works, 91st Cong., 2d Sess. (1970), pt. 1, at 143. Although the above statement addresses itself to a different factual situation than the one before this Court, it explicitly sets forth that the general purpose and intention of the federal government's position in air pollution field is to prevent any deterioration of our nation's air quality.

Based upon the foregoing analysis of the Clean Air Act Amendments of 1970 and of the December 6, 1973 Regulations this Court concludes that plaintiffs have no support for their contention that the new federal regulations preempted and thus invalidated §§ 1403.2–13.11 and 1403.2–13.12 of New York City's administrative code. Therefore, plaintiffs' motion for summary judgment is hereby denied.

So ordered.