**EXXON CORPORATION,**
Plaintiff-Appellant,

v.

**The CITY OF NEW YORK, et al.,**
Defendants-Appellees.

**GETTY OIL CO. (EASTERN OPERATIONS), INC., et al.,**
Plaintiffs-Appellants,

v.

**The CITY OF NEW YORK, et al.,**
Defendants-Appellees.

No. 2, Docket 74–1806.

United States Court of Appeals,
Second Circuit.

Argued Dec. 13, 1976.

Decided Jan. 17, 1977.

Kent Sinclair, Jr., New York City (Shearman & Sterling, Robert L. Norris, Houston,

Joseph T. McLaughlin, New York City, of counsel), for plaintiff-appellant Exxon Corp.

Miles F. McDonald, New York City (Shea, Gould, Climenko & Casey, Richard F. Czaja, New York City, of counsel), for plaintiffs-appellants Getty Oil Co., Gulf Oil Co., Mobil Oil Corp. and Sun Oil Co. of Pa.

Evelyn J. Junge, New York City (W. Bernard Richland, Corp. Counsel, Alexander Gigante, Jr., New York City, of counsel), for defendants-appellees.

Before MULLIGAN and VAN GRAAFEILAND, Circuit Judges and GAGLIARDI, District Judge.*

MULLIGAN, Circuit Judge:

Plaintiffs-appellants appeal from an opinion and order dated March 8, 1974 of the Hon. Charles E. Stewart, Jr., United States District Judge for the Southern District of New York, reported at 372 F.Supp. 335, denying their motion for summary judgment on Count I in their complaints. This otherwise unappealable interlocutory order is before the court pursuant to 28 U.S.C. § 1292(b). Since the only issue before this court is whether certain local air pollution regulations are preempted by the federal statute and regulations governing the same subject, we will review the local and federal law, as well as the history of this litigation, before proceeding to the merits.

I

On August 20, 1971 the City of New York amended its Administrative Code to provide for controls regulating the lead content and the volatility of gasoline offered for sale in the City. §§ 1403.2–13.11 and 1403.2–13.12 of Chapter 57 of the Administrative Code of New York City (N.Y.C. Admin. Code). The City's regulations provided for a staggered reduction in the lead content of gasoline.

By January 1, 1973 it was to contain no more than 0.5 gram of lead per gallon and a year later the lead content of gasoline sold in New York City was not to exceed 0.075 gram per gallon. N.Y.C. Admin.Code § 1403.2–13.11(a)(3) and (4).

Congress in 1970 amended the Clean Air Act, 42 U.S.C. §§ 1857 *et seq.* (the Act), authorizing the Administrator (Administrator) of the Federal Environmental Protection Agency (E.P.A) to issue regulations controlling or prohibiting the use of a fuel or fuel additive upon finding that its use either endangered the public health or welfare or that it significantly impaired the performance of any emission control device. P.L. 91–604, § 9(a) (Dec. 31, 1970), 84 Stat. 1698, codified at 42 U.S.C. § 1857f–6c(a). A preemption provision was included in the section:

> Except as otherwise provided in subparagraph (B) or (C), no State (or political subdivision thereof) may prescribe or attempt to enforce, for purposes of motor vehicle emission control, any control or prohibition respecting use of a fuel or fuel additive in a motor vehicle or motor vehicle engine—
>
> (i) if the Administrator has found that *no control or prohibition under paragraph* (1) is necessary and has published his finding in the Federal Register, or
>
> (ii) if the Administrator has prescribed under paragraph (1) a control or prohibition applicable to such fuel or fuel additive, unless State prohibition or control is identical to the prohibition or control prescribed by the Administrator.

42 U.S.C. § 1857f–6c(c)(4)(A). The statute allows a state to issue regulations with respect to fuels for purposes of motor vehicle emission control if such regulations are provisions contained in an implementation plan provided for in 42 U.S.C. § 1857c–5 and

---

* Hon. Lee P. Gagliardi, United States District Court for the Southern District of New York, sitting by designation.

approved by the Administrator. 42 U.S.C. § 1857f–6c(c)(4)(C).[1]

On January 10, 1973 the Administrator, in order to prevent the impairment of catalytic converters, an emission control device, promulgated regulations that were to become effective on February 9, 1973 governing the lead content of gasoline. 38 Fed. Reg. 1254–56. These regulations, which are still in effect, provided, *inter alia*, that all retail gasoline outlets dispensing 200,000 or more gallons annually must offer for sale at least one grade of unleaded gasoline. They also required that the nozzles on lead and unleaded gas pumps be different sizes. 40 C.F.R. § 80.22. Unleaded gasoline was defined as "gasoline containing not more than 0.05 gram of lead per gallon." 40 C.F.R. § 80.2(g).

The Administrator on December 6, 1973, based on the needs of public health, published more regulations concerning the lead content in gasoline which were to become effective January 7, 1974. 38 Fed.Reg. 33734–41. These regulations provided a staggered schedule for gasoline refiners to follow in reducing the fuel's lead content to the ultimate goal of 0.5 gram per gallon after January 1, 1979. 40 C.F.R. § 80.20. The promulgated schedule was in the Administrator's judgment "reasonable from the standpoint of protection of health and from the standpoint of economic and technological feasibility." 38 Fed.Reg. 33734. Lead additive manufacturers were required to submit quarterly reports to the Administrator showing the amount of lead shipped to each refinery during the reporting period. 40 C.F.R. § 80.25. A panel of the District of Columbia Circuit set aside these regulations on December 20, 1974. Consequently, the E.P.A. suspended their enforcement. 40 Fed.Reg. 7480 (Feb. 20, 1975). On March 19, 1976, sitting en banc, the District of Columbia Circuit upheld the reg-

ulations. *Ethyl Corporation v. Environmental Protection Agency*, 541 F.2d 1. The E.P.A. reinstated the reporting requirements of 40 C.F.R. §§ 80.20(a)(3), 80.25 on April 1, 1976. 41 Fed.Reg. 13984. Certiorari was denied by the Supreme Court on June 14, 1976, 426 U.S. 941, 96 S.Ct. 2662, 2663, 49 L.Ed.2d 394 and since the litigation as to the regulations' validity was ended, the E.P.A. published a notice on July 9, 1976 announcing its termination of the suspension of their enforcement. 41 Fed.Reg. 28352. The Agency amended the regulations concerned with public health, 40 C.F.R. § 80.20, on September 28, 1976. It changed the lead phase-down schedule by moving the required date for gasoline with 0.5 gram of lead per gallon from January to October, 1979 and also added new reporting requirements. It left in effect a 0.8 gram per gallon standard to begin January 1, 1978. 41 Fed.Reg. 42676.

Appellant Exxon Corporation (Exxon) on November 6, 1972 applied to the New York City Environmental Protection Administration for a variance from the provisions of N.Y.C. Admin.Code § 1403.2–13.11(a)(3) which was to become effective on January 1, 1973 and required that all grades of gasoline intended for use in New York City not have a lead content exceeding 0.5 gram per gallon. Exxon requested the relief on the two grounds: that this restriction was an onerous burden and that the E.P.A was preparing national regulations on lead in gasoline. The E.P.A. on January 10, 1973 issued its fuel regulations based on emission control devices, 40 C.F.R. § 80.22. On February 16, 1973 the City rejected Exxon's application for a variance from its regulations. Exxon then commenced this action against the City of New York on March 9, 1973. It was consolidated with a similar action against the same defendant begun on March 14, 1973 by Getty Oil Co. (Eastern

---

1. 42 U.S.C. § 1857f–6c(c)(4)(B) also provides an exception to the comprehensive preemption language of 42 U.S.C. § 1857f–6c(c)(4)(A). 42 U.S.C. § 1857f–6c(c)(4)(B) provides:

> Any State for which application of section 1857f–6a(a) of this title has been waived under section 1857f–6a(b) of this title may at

any time prescribe and enforce for the purpose of motor vehicle emission control, a control or prohibition respecting any fuel or fuel additive.

Since New York has admittedly received no such waiver this exception is not applicable here.

Operations), Inc., Gulf Oil Co.-U.S., Mobil Oil Corporation, and Sun Oil Company of Pennsylvania (Getty plaintiffs). Appellants' complaints, as now amended, allege in Count I that 42 U.S.C. § 1857f-6c and the regulations issued thereunder preempted N.Y.C. Admin.Code § 1403.2-13.11(a)(3) and (4). In Count II it is alleged that the City regulations on the lead content of gasoline discriminate against and impose an impermissible burden upon interstate commerce. Both counts seek declaratory and injunctive relief against these regulations. In addition, the Getty plaintiffs seek the same relief against the city's volatility requirements in N.Y.C.Admin.Code § 1403.2-13.12.

On March 22, 1973 Judge Stewart denied appellants' motions for a preliminary injunction. *Exxon Corporation v. City of New York*, D.C., 356 F.Supp. 660. Judge Stewart did order a stay pending appeal which enjoined the defendant from enforcing N.Y.C. Admin. Code § 1403.2-13.-11(a)(3). A panel of this court on May 17, 1973 continued that stay and remanded for a prompt trial. 480 F.2d 460. On March 8, 1974 Judge Stewart denied appellants' motion for summary judgment on their preemption claim. 372 F.Supp. 335. On April 15, 1974 the district court, pursuant to 28 U.S.C. § 1292(b), certified the order to this court which accepted it on May 28, 1974. Oral argument was postponed until a final determination by the District of Columbia Court of Appeals in *Ethyl Corporation v. Environmental Protection Agency, supra.* Certiorari having been denied in that case

and the validity of the public health based regulations having been upheld, the appeal is finally before us.

## II

We note at the outset that this is not a case where we are asked to infer preemption because the Congress has legislated in the same area as the City of New York, but rather this is the unusual case where explicit preemption language appears in the Act.[2] We recognize that the exercise of federal supremacy is not lightly to be presumed and that there must be a clear manifestation of a congressional purpose to supersede the exercise of power by the state. *New York State Department of Social Services v. Dublino*, 413 U.S. 405, 413, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973); *Schwartz v. Texas*, 344 U.S. 199, 202-03, 73 S.Ct. 232, 97 L.Ed. 231 (1952); see Murphy & La Pierre, Nuclear "Moratorium" Legislation in the States and the Supremacy Clause, 76 Colum.L.Rev. 392 (1976). Thus our task is to determine the congressional intention expressed in an Act which is extremely complex. This task is further complicated by a paragraph, subparagraph and sub-sub-paragraph system of alphabetical and numbered headings which adds confusion.[3] Nonetheless there are three basic provisions in the statute from which a pattern of preemption arises which is fatal to the City's ordinances and requires reversal here, the granting of summary judgment for the appellants and the nullification of both of the City regulations in issue.

**2.** In *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), the Court explained the test to be applied when a congressional intent to preempt state regulation appears in the statute. When Congress has acted "so unequivocally as to make clear that it intends no regulation except its own," the standard "is whether the matter on which the State asserts the right to act is in any way regulated by the Federal Act. If it is, the federal scheme prevails though it is a more modest, less pervasive regulatory plan than that of the State." Id. at 236, 67 S.Ct. at 1155.

**3.** This court's recent comments on the Social Security Act are appropriate here:

As program after program has evolved, there has developed a degree of complexity

in the Social Security Act and particularly the regulations which makes them almost unintelligible to the uninitiated. There should be no such form of reference as "45 C.F.R. § 248.3(c)(1)(ii)(B)(2)" discussed below; a draftsman who has gotten himself into a position requiring anything like this should make a fresh start.

*Friedman v. Berger*, 547 F.2d 724, 727 n. 7 (2d Cir. 1976). The difficulties involved with such a cumbersome system are exemplified in this case where we note that the reproduction of § 1857d-1 in the U.S.C.A. contains a typographical error, misprinting § 1857f-6c(c)(4) as § 1857-6c(c)(4). Compare 42 U.S.C. § 1857d-1 with 42 U.S.C.A. § 1857d-1 (Supp.1976).

## A. Lead Content

1) The prime section involved, and the only provision considered below, is section 1857f–6c(c)(4)(A) which is set forth *supra.* That section explicitly precludes a state or any political subdivision thereof from prescribing or attempting to prescribe any controls or prohibition respecting the use of fuels or fuel additives in motor vehicles, if the Administrator has prescribed an applicable control or prohibition unless the state prohibition or control is identical to that prescribed by the Administrator. There is no question but that the Administrator has promulgated standards prescribing controls and prohibitions with respect to the lead content of gasoline used in motor vehicles. 40 C.F.R. § 80.20 *et seq.*[4] Neither is there any question that N.Y.C. Admin. Code § 1403.2–13.11 which prescribes a lead con-

tent for gasoline used in the City of New York is not identical to the federal regulations. Indeed, the local ordinance is more demanding as to both lead content and the time limitations within which such reduction must be achieved.[5] In face of the clear preemption language of section 1857f–6c(c)(4)(A) it is difficult to perceive how the non-identical City regulation can survive.

The City has argued, and its position was accepted below, that since the federal controls on lead content do not become applicable until January 1, 1978, federal preemption does not become effective until that time.[6] We cannot accept this position.[7] While the timetable for reduction of lead content does not commence until January 1, 1978, the regulation imposing them becomes effective on September 28, 1976. This is no mere quibble. Under the amended regulations, a host of monitoring and reporting provisions, some set forth in the margin[8]

---

**4.** The existence of these controls distinguishes the present case from *Allway Taxi, Inc. v. City of New York*, 340 F.Supp. 1120 (S.D.N.Y.), aff'd, 468 F.2d 624 (2d Cir. 1972) (per curiam). In that case an argument that a New York City regulation requiring use of low-lead gasolines by taxicabs was preempted by 42 U.S.C. § 1857f–6c(c)(4) was rejected because the Administrator had neither issued regulations nor found that such regulations were unnecessary. 340 F.Supp. at 1123. Here, the regulations have been issued and are in effect.

**5.** N.Y.C. Admin. Code § 1403.2–13.11 provides:
(a) No person shall cause or permit the use, or, if intended for use in the City of New York, the purchase, sale, offer for sale, storage or transportation of gasoline which contains more than the following amount of lead by weight for the respective octane ranges as follows:

| | | 95.9 Octane No. & Above | Below 95.9 Octane No. |
|---|---|---|---|
| (1) | On and after November 1, 1971 | 2.0 grams per gal. | 1.5 grams per gal. |
| (2) | On and after January 1, 1972 | 1.0 grams per gal. | 1.0 grams per gal. |
| (3) | On and after January 1, 1973 | 0.5 grams per gal. | 0.5 grams per gal. |
| (4) | On and after January 1, 1974 | zero grams | zero grams |

(b) Where the lead content of gasoline is restricted to zero grams per gallon as in sub-section a, gasoline which contains 0.075 grams of lead per gallon shall be deemed to meet such restriction. (Footnotes omitted.) Whereas 40 C.F.R. § 80.20, as amended 41 Fed.Reg. 42677 (Sept. 28, 1976), provides in part:

(a)(1) In the manufacture of gasoline at any refinery, no gasoline refiner shall exceed the average lead content per gallon specified below for each 3-month period (January through March, April through June, July through September, October through December):
(i) 0.8 grams of lead per gallon, after January 1, 1978, except as provided in paragraph (a)(4) of this section.
(ii) 0.5 grams of lead per gallon after October 1, 1979. Suspension of the 0.8 g/p/g is possible only if a refiner shows that he has taken steps toward achieving compliance at the earliest practicable date.

**6.** At the time of the trial court's decision in this case, March 8, 1974, the federal low-lead regulations were to go into effect in 1975. 372 F.Supp. at 340.

**7.** Cf. *Upholstered Furniture Action Council v. California Bureau of Home Furnishings*, 415 F.Supp. 63, 64 (E.D.Cal.1976).

**8.** These requirements include quarterly reports by gasoline refiners showing the grams of lead additive in inventory and the average lead content in each gallon of gasoline produced during the quarter. 40 C.F.R. § 80.20(a)(3). Lead additive manufacturers must submit quarterly reports to the Administrator showing the total grams of lead shipped to each refinery during the period. 40 C.F.R. § 80.25. The Administrator is empowered to require any refiner after January 31, 1977 to submit reports, schedules, contracts and any other information that he deems relevant in determining compliance with the lead-reduction schedule. These are to be

have been imposed upon the gasoline industry. The authority of the Administrator is not limited merely to ascertaining the permissible lead content of gasoline in grams per gallon. He is authorized to regulate "the manufacture, introduction into commerce, offering for sale, or sale" of fuel or fuel additives. 42 U.S.C. § 1857f–6c(c)(1). The controls presently existing are directed to ensuring that the industry is physically prepared to manufacture low-lead gasoline by the January 1, 1978 deadline. 41 Fed. Reg. 42675–77 (Sept. 28, 1976). Hence, there is a necessary nexus between the existing controls on the industry and the phase-down timetable promulgated by the Administrator. Preemption therefore has already taken place and the conflicting City regulatory scheme must fall.

The City argues that the preemption language of a statute must be narrowly construed where the exercise of the local police power serves the purpose of the federal act. *Chrysler Corporation v. Tofany*, 419 F.2d 499 (2d Cir. 1969). We do not cavil at the principle but find that the City ordinances here do not serve the purpose of the federal act but in fact disrupt it. The problems faced by the Administrator in determining the quality of national ambient air [9] are made evident from a reading of the text accompanying the promulgation of the amended regulations of 40 C.F.R. § 80.20 revising the lead content phase-down schedule and providing for its enforcement by controls now effective. 41 Fed.Reg. 42675–77 (Sept. 28, 1976). On the basis of analyses made by private consultants to the E.P.A. and the Federal Energy Administration (F.E.A.), as well as a preliminary assessment of F.E.A., the E.P.A. concluded that due to the gasoline industry's inability to produce sufficient high octane gasoline enforcement of the then promulgated lead phase-down schedule could result in a gasoline shortage of about 6.6% of demand in 1977 and 9% in 1978. The Administrator

stated that "the intent of these regulations is to achieve the desired reduction of lead in gasoline as expeditiously as practicable for protection of public health without causing a gasoline shortage." 41 Fed.Reg. 42676.

These considerations account for the amendments to the phase-down schedule which took into consideration both the technological problems of the industry which must add equipment and plant capacity on an expedited basis and the concern for preserving energy in a period of national shortage. What consideration the City of New York may have given these factors in 1971 does not appear in the record before us. In sum, logic as well as the express language of section 1857f–6c(c)(4)(A) mandate that the City regulation be identical to that of the Administrator. Fragmented, piecemeal local legislation could only bring chaos particularly in view of the national character of the industry supplying motor vehicle fuel and the technical problems associated with the production of unleaded gasoline.

2) Our inquiry into this question does not cease here. We find that the federal scheme does not impose a complete strait jacket on the states or their subdivisions. Section 1857f–6c(c)(4) which in subdivision (A) precludes local regulation unless identical to federal regulation, provides a relevant exception in subdivision (C). That section allows a state to prescribe a control or prohibition respecting the use of a fuel or fuel additive in a motor vehicle if such restriction is included as a provision in an applicable implementation plan for such state as provided under section 1857c–5. The state restrictions so allowed could be more severe than the federal regulations. The Administrator may approve a state plan with a provision governing automotive fuels "if he finds that the State control or prohibition is necessary to achieve the national primary or secondary ambient air quality standard which the plan implements." 42 U.S.C. § 1857f–6c(c)(4)(C).

---

produced upon thirty days written notice. 40 C.F.R. § 80.20(a)(vi).

9. 40 C.F.R. § 50.1(e) defines ambient air as "that portion of the atmosphere, external to buildings, to which the general public has access."

Thus the Act provides a mechanism which would allow New York to set up standards concerning fuels that varied from the federal norms.[10]

It was emphasized below and argued here that the court should not lightly strike down a regulation which could result in the degradation of the air breathed by the residents of New York City (including the judiciary). As explained above, Congress has not precluded variation so long as the local regulation has been made part of a state implementation plan approved by the Administrator. Aside from the admission that no such implementing plan has been submitted, there is no explanation for the state's inaction. Thus we are not in the position of reviewing the Administrator's action in approving or disapproving a state implementation plan embracing the City's regulations. The Administrator is a stranger to this litigation.

That the only permissible local variance is that allowed by this section is made clear in the legislative history of the 1970 Amendments to the Clean Air Act. The Conference Report stated:

> No State may prescribe or enforce controls or prohibitions respecting any fuel or additive unless they are identical to those prescribed by the Federal Government or unless a State implementation plan under sec. 110 [42 U.S.C. § 1857c–5] includes provision for fuel or additive control and such plan is approved by the Administrator as being necessary for achievement of national air quality standards. These restrictions will not apply to California.

Conf.Rep. 91–1783, 91st Cong., 2d Sess., reprinted in 3 U.S.Code Cong. & Admin. News, pp. 5374, 5385 (1970).

3) Any doubt that the Congress has explicitly provided for state or local regulation here only through the route of a state implementation plan is removed when we consider the third applicable section of the statute. Section 1857d–1 provides:

> Except as otherwise provided in sections 1857c–10(c), (e) and (f), 1857f–6a, 1857f–6c(c)(4) and 1857f–11 of this title (preempting certain State regulation of moving sources) nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution; except that if an emission standard or limitation is in effect under an applicable implementation plan or under section 1857c–6 or section 1857c–7 of this title, such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan or section.

(Emphasis supplied).

We note that the statute itself refers to the preemption of state regulation of moving sources (as distinguished from stationary sources)[11] and reserves to the state or subdivision the right to enforce its own standards respecting emissions of air pollutants except as provided in certain sections including section 1857f–6c(c)(4) which is the basic preemption statute here in issue. The legislative history again is enlightening.

---

**10.** In *Donelon v. New Orleans Terminal Co.*, 474 F.2d 1108, 1112 (5th Cir.), cert. denied, 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973), the Fifth Circuit reasoned that when a federal statute expressly preempts state regulation and "the Act specifically authorizes a narrow spectrum of deviation from national uniformity" attempts at state regulation must fall within the authorized exceptions. New York, while submitting implementation plans as required by 42 U.S.C. § 1857c–5(a)(1), see *Friends of the Earth v. Carey*, 552 F.2d 25 (2d Cir. 1977), has not submitted a plan containing provisions

that called for local controls on automotive fuels and fuel additives that would be more stringent than the federal regulations.

**11.** 40 C.F.R. § 60.2 defines stationary source as "any building, structure, facility, or installation which emits or may emit any air pollutant and which contains any one or combination of the following:
    (1) Affected facilities.
    (2) Existing facilities.
    (3) Facilities of the type for which no standards have been promulgated in this part.

With respect to section 1857d–1 it states, "Except with respect to standards for moving sources, the States' authority to adopt and enforce standards applicable to air quality and emissions is retained in the conference substitute." Conf.Rep. 91–1783, *supra*, 3 U.S.Code Cong. & Admin.News at 5381.[12]

We conclude therefore that with respect to standards for moving sources such as the gasoline utilized in motor vehicles, the Congress has explicitly provided that state or local regulation is preempted unless such control or prohibition is identical with the federally promulgated standards. Variation is permitted only if it is accomplished through the mechanism of a state implementation plan, a procedure not followed here. The right of a state or subdivision to proceed on its own without approval of the Administrator is limited to the regulation of fuel in stationary sources and therefore not pertinent to the issue before us.

### B. *The Volatility Ordinance*

The Getty plaintiffs have also sought declaratory and injunctive relief with respect to the City's volatility regulation. N.Y.C. Admin.Code § 1403.2–13.12.[13] This regulation was an attempt by the City to deal with the problem caused by evaporated hydrocarbons emitted into the air by gasoline. Gasoline volatility is limited by removing the butane-pentane ($C_4C_5$) fraction. This cut is replaced by another hydrocarbon fraction with a lower front end volatility. This process results in gasoline with a high-

er evaporation curve and usually an increased octane rating. The City has argued successfully below that since the Administrator has not promulgated any regulation at all with respect to volatility and has failed to make any finding that no regulation is needed, preemption has not taken place under section 1857f–6c(c)(4)(A). This presents a closer question than the City lead content regulation which squarely conflicts with the federal regulation governing that precise fuel additive. Moreover, the City urges that in no instance is lead used or required to replace the $C_4C_5$ fraction.

We note however that the pertinent federal regulation provides, "This part prescribes regulations for the control and/or prohibition of fuels and additives for use in motor vehicles and motor vehicle engines." 40 C.F.R. § 80.1. Since the federal regulations make no reference to the volatility of gasoline, it cannot be said that the City has imposed controls or prohibitions "identical" to the prohibitions or controls prescribed by the Administrator. The City has added a control or prohibition applicable to the fuel of motor vehicles which is more onerous than that provided by the Administrator. Thus N.Y.C. § 1403.2–13.12 is preempted by section 1857f–6c(c)(4)(A) and the regulations thereunder.

Aside from this as we have pointed out, the congressional scheme only allows such variance if contained as a provision in an approved state implementing plan and allows unilateral action only in the case of emissions from stationary sources. Neither

---

12. Also enlightening is the supreme court's dictum in *Washington v. General Motors Corp.*, 406 U.S. 109, 114, 92 S.Ct. 1396, 1398, 31 L.Ed.2d 727 (1972):

   Air pollution is, of course, one of the most notorious types of public nuisance in modern experience. Congress has not, however, found a uniform, nationwide solution to all aspects of this problem and, indeed, has declared "that the prevention and control of air pollution at its source is the primary responsibility of States and local governments." 81 Stat. 485, 42 U.S.C. § 1857(a)(3). To be sure, *Congress has largely preempted the field with regard to* "emissions from new motor vehicles," 42 U.S.C. § 1857f–6a(a); 31 Fed.

Reg. 5170 (1966); and *motor vehicle fuels and fuel additives*, 84 Stat. 1699, 42 U.S.C. § 1857f–6c(c)(4).
(Emphasis supplied.)

13. N.Y.C. Admin. Code § 1403.2–13.12 provides:

   Effective October 1, 1971, no person shall cause or permit the use, or, if intended for use in the city of New York, the purchase, sale, offer for sale, storage or transportation of gasoline which exceeds the following volatility limits:
   (a) For the period October 1, through April 30, not to exceed 12 Reid Vapor pressure.
   (b) For the period May 1, through September 30, not to exceed 7 Reid vapor pressure.

**1096**

exception is pertinent here. Again, the scheme makes sense. We have nothing in the record before us to indicate what, if any, plant, equipment or technological changes may be required to assure compliance with the City's volatility regulation. Whether it has any effect on national energy sources is also beyond our ken. The Act sensibly provides for an exception from its comprehensive preemption of local regulation of motor vehicle fuels only when such regulation is a provision in a state implementation plan approved by the Administrator who has the competence to make the needed professional engineering and energy conservation decisions. The alternative is a host of varying and conflicting state and local ordinances which can only create confusion and thwart the objectives of the Act.

While it has been urged that we should give a narrow interpretation to the congressional preemption statutes here involved, we note that "each case turns on the peculiarities and special features of the federal regulatory scheme in question." *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 638, 93 S.Ct. 1854, 1862, 36 L.Ed.2d 547 (1973). We have commented at some length on the federal regulatory scheme at issue and are persuaded that the provisions of the City regulating lead content and volatility, N.Y.C. Admin. Code §§ 1403.2–13.11 and 1403.2–13.12 have been preempted and are therefore void. The judgment below is reversed and remanded to the district court with instructions to enter summary judgment for the plaintiffs-appellants.