AMERICAN PETROLEUM INSTITUTE, Plaintiff,

v.

Thomas JORLING, as Commissioner of the New York State Department of Environmental Conservation,

and

The New York State Department of Environmental Conservation, Defendants.

No. 89–CV–238.

United States District Court, N.D. New York.

April 4, 1989.

Cleary, Gottlieb, Steen & Hamilton, New York City, McNamee, Lochner, Titus & Williams, Albany, N.Y., for plaintiff; Thomas J. Moloney, Michael R. Chayet, New York City, Charles F. Lettow, John M. Bredehoft, G. William Frick, David T. Deal, Washington, D.C., and G. Kimball Williams, Albany, N.Y., of counsel.

Robert Abrams, Atty. Gen. of State of N.Y., Albany, N.Y., for defendants; David R. Wooley and Michael J. Moore, of counsel.

Com. of Mass., James M. Shannon, Atty. Gen., Boston, Mass., amicus curiae; Janet G. McCabe, of counsel.

## MEMORANDUM–DECISION AND ORDER

McAVOY, District Judge.

## INTRODUCTION

Plaintiff American Petroleum Institute (API), a corporate trade association with approximately 200 members engaged in every facet of the petroleum business including production, refining, transportation and marketing, has moved, following commencement of the present action, for a preliminary injunction barring enforcement of a regulation on motor vehicle fuel volatility recently promulgated by defendant New York State Department of Environmental Conservation (DEC). The DEC regulation limits volatility of motor vehicle fuels sold to retailers, merchants or industrial, institutional or commercial users in New York State to a Reid Vapor Pressure (RVP) of 9.0 pounds per square inch or less from May 1 through September 15 of each year beginning in 1989. *See* 6 N.Y.C.R.R. § 225–3.1 through .5 (Fuel Composition and Use—Volatile Motor Fuel). The regulation (hereafter referred to as the "RVP Rule") was published in the New York State Register on December 21, 1988 and became effective on January 6, 1989. *See* N.Y.St. Reg., Vol. X, Issue 51 at 15 [Plaintiff's Exh 1].

Plaintiff contends that the action of the DEC in establishing the RVP Rule contravenes the explicit preemption provisions in the federal Clean Air Act, *see* 42 U.S.C. § 7545(a) and (c), and therefore runs afoul of the Supremacy Clause of the U.S. Constitution, that the imposition of the RVP Rule violates the Commerce Clause in that the RVP Rule is unduly burdensome on interstate commerce when evaluated in light of the balancing test articulated by the Supreme Court for judging state regulatory acts against the "dormant Commerce Clause," and that the adoption of the RVP Rule was flawed in a number of procedural and substantive respects and is thus invalid under State law. In moving for preliminary injunctive relief, plaintiff argues that its members and the public will suffer irreparable harm if the injunction is not granted, that it is likely to succeed on the merits of its claims and that, in any event, the balance of hardships tips in its members' favor.

Defendants, in addition to opposing plaintiff's request for preliminary injunctive relief, have cross-moved to dismiss this action or, alternatively, to stay the action pending resolution of certain matters currently under consideration by the Environmental Protection Agency.

For the reasons that follow, the court denies defendants' cross motion and, cognizant of the discretion it possesses in passing upon requests for equitable relief, also denies plaintiff's motion for preliminary injunctive relief.

## BACKGROUND

### A. *The Parties*

Plaintiff API is a corporate trade association organized under the laws of the District of Columbia. Defendant DEC is a New York State agency and is charged with the responsibility of implementing the RVP Rule. Defendant Thomas Jorling is, and at all relevant times was, the Commissioner of the DEC.

### B. *Gasoline Volatility*

Gasoline used as a motor vehicle fuel is a volatile mixture of liquid hydrocarbons, generally containing small quantities of additives. One characteristic of liquid gasoline is that it gives off small amounts of "volatile organic compounds" under certain pressure and temperature conditions. ("Volatility," referred to above, means the tendency of a liquid like gasoline to evaporate and thus change into a gaseous state.) The organic compounds given off are among the materials that participate in the complex process leading to the formation of ground-level ozone. The DEC has stated that its intention in promulgating the RVP Rule is "to reduce emissions of gasoline vapors caused by evaporation as one strategy to reduce ground level ozone concentrations." DEC "Assessment of Public

Comments" (DEC Assessment), Plaintiff's Exh 2, at Response to Issue no. 20.

Gasoline volatility is expressed as a measurement in pounds per square inch of what is called Reid Vapor Pressure (RVP). The American Society for Testing and Materials (ASTM) has established five "volatility classes" of gasoline, the lowest class A through the highest class E, based on the measured RVP of gasoline. Class E gasoline has an RVP of 15 psi and has been deemed suitable for use in cold winter climates; class A gasoline has an RVP of 9.0 psi and has been deemed suitable for use in hot weather climates in the summer, as is the case now for Arizona, New Mexico, California, West Texas and southern Nevada. Different classes of gasoline are used in different climatic conditions to ensure that motor vehicle engines will start in cold climates (such climates requiring a relatively high RVP) but will not experience vapor lock in hot climates (such climates requiring a lower RVP). The ASTM "volatility classes" have been relied on in determining whether and when a gasoline of a specific RVP may be shipped to a particular area of the country. *See* ASTM "Standard Specification for Automotive Gasoline," Plaintiff's Exh 4. The specifications have remained essentially unchanged since 1970.

## C. *Federal Regulation of Motor Vehicle Fuel*

Section 211 of the Clean Air Act, 42 U.S.C. § 7545 (1988), authorizes the Administrator of the Environmental Protection Agency (EPA) to designate and register fuels and fuel additives, 42 U.S.C. § 7545(a) and (b), and to promulgate regulations regarding

> the manufacture, introduction into commerce, offering for sale, or sale of any fuel or fuel additive for use in a motor vehicle or motor vehicle engine (A) if in the judgment of the Administrator any emission product of such fuel or fuel additive causes, or contributes, to air pollution which may reasonably be anticipated to endanger the public health or welfare ...

*id.* § 7545(c)(1). No fuel or fuel additive may be controlled or prohibited by the Administrator pursuant to § 7545(c)(1)(A) "except after consideration of all relevant medical and scientific evidence available to him," *id.* § 7545(c)(2)(A), and "unless he finds, and publishes such finding, that in his judgment such prohibition will not cause the use of any other fuel or fuel additive which will produce emissions which will endanger the public health or welfare to the same or greater degree than the use of the fuel or fuel additive proposed to be prohibited," *id.* § 7545(c)(2)(C).

Pursuant to its statutory authority, the EPA has promulgated 40 C.F.R. part 79 (Registration of Fuels and Fuel Additives) (1988) and 40 C.F.R. part 80 (Regulation of Fuels and Fuel Additives) (1988). The EPA has designated leaded and unleaded motor vehicle gasoline as a "fuel" under section 211 of the Clean Air Act, 40 C.F.R. § 79.32(a); motor vehicle gasoline must therefore be registered, *id.* § 79.32(b). As a consequence of the registration requirement, fuel manufacturers must submit to the Administrator the "highest, lowest, and average values of the listed characteristics/properties" of the fuel, one of which is the Reid vapor pressure value. *Id.* § 79.32(c). Part 80 sets forth "regulations for the control and/or prohibition of fuels and additives for use in motor vehicles and motor vehicle engines." 40 C.F.R. § 80.1(a). These regulations, among other things, limited the lead content of gasoline as a motor vehicle fuel and required retailers to make unleaded gasoline (at specified minimum octane levels) available for sale; regulation of gasoline volatility and Reid vapor pressure had not as yet been undertaken.

On March 10, 1989, after the commencement of the present action, the EPA promulgated section 80.27 (Controls and Prohibitions on Gasoline Volatility), which constitutes "Phase I of a proposed two-phase reduction in summertime commercial gasoline volatility," as an amendment to 40 C.F.R. part 80. 40 CFR Part 80—Notice of Final Rulemaking, 54 Fed.Reg. 11868 (March 22, 1989) [Plaintiff's Reply Exh 1]. Basically, the new regulation, which be-

comes effective on April 21, 1989, provides that, beginning in the summer of 1989, gasoline Reid vapor pressure must not exceed 10.5 psi, 9.5 psi or 9.0 psi depending on the area of the country and the month. Specifically, 40 C.F.R. § 80.27(a) states, insofar as relevant, as follows:

> During regulatory control periods no refiner, importer, distributor, reseller, carrier, retailer or wholesale purchaser-consumer shall sell, offer for sale, dispense, supply, or offer for supply, or transport gasoline whose Reid vapor pressure exceeds the applicable standard. As used in this section and § 80.28 [liability for violations], "applicable standard" means the standard listed in this paragraph for the geographical area and time period in which gasoline is intended to be dispensed to motor vehicles or, if such area and time period cannot be determined, the standard listed in this paragraph that specifies the lowest Reid vapor pressure for the year in which the gasoline is sampled. As used in this section and § 80.28, "regulatory control periods" means the following periods during calendar year 1989: June 30, to September 15 for retail outlets and wholesale purchaser-consumer facilities; and June 1, to September 15 for all other facilities.

54 Fed.Reg. at 11883. Insofar as relevant to this suit, the RVP standard applicable to New York State for June through September is 10.5 psi; a 9.0 psi RVP standard is required for a few parts of the country during June through August. *See* "Applicable Standards" Table, 54 Fed.Reg. at 11883–11884.

As part of the federal regulation of gasoline as a fuel for motor vehicles, Congress, in section 211(c)(4) of the Clean Air Act, 42 U.S.C. § 7545(c)(4), and the EPA, in 40 C.F.R. § 80.1(b) (effective May 19, 1977) and, more recently, in the Preamble to the amendments to part 80, *see* 54 Fed.Reg. at 11882 (VIII. *Interaction With State Volatility Requirements*), have spoken on the interrelationship of federal and state action. Section 211(c)(4)(A) provides that:

> Except as otherwise provided in subparagraph (B) or (C), no State (or political subdivision thereof) may prescribe or attempt to enforce, for purposes of motor vehicle emission control, any control or prohibition respecting use of a fuel or fuel additive in a motor vehicle or motor vehicle engine—
>
> (i) if the Administrator has found that no control or prohibition under paragraph (1) is necessary and has published his finding in the Federal Register, or
>
> (ii) if the Administrator has prescribed under paragraph (1) a control or prohibition applicable to such fuel or fuel additive, unless State prohibition or control is identical to the prohibition or control prescribed by the Administrator.

42 U.S.C. § 7545(c)(4)(A). As noted, two exceptions to the limitations on State authority are provided: the first in effect grants California a special waiver, *see id.* § 7545(c)(4)(B); the second permits a State to "prescribe and enforce" divergent regulations

> if an applicable implementation plan for such State under section 7410 of this title so provides. The Administrator may approve such provision in an implementation plan ... only if he finds that the State control or prohibition is necessary to achieve the national primary or secondary ambient air quality standard which the plan implements,

*id.* § 7545(c)(4)(C).

Prior to the adoption of the regulations regarding gasoline volatility standards, 40 C.F.R. § 80.1(b) stated that "[n]othing in this part is intended to preempt the ability of State or local governments to control or prohibit any fuel or additive for use in motor vehicles and motor vehicle engines which is not explicitly regulated by this part." More recently, as part of the supporting and explanatory materials to the regulations amending part 80, the EPA Administrator has declared as follows:

> As discussed in the preamble for the volatility NPRM [Notice of Proposed Rulemaking], Section 211(c)(4) of the Clean Air Act prohibits states from enacting controls on a fuel that are different from EPA controls, except in certain

circumstances. Thus, the Phase I RVP control program finalized today will preempt any state (except California) from enforcing RVP controls different from EPA's unless such a program is approved in a State Implementation Plan (SIP) (or unless the purpose is something other than air quality improvement).

EPA's decision on whether to approve an ozone SIP amendment proposing a different RVP control program will hinge on whether the Agency makes a finding that such a program is necessary to achieve the National Ambient Air Quality Standard for ozone. EPA has proposed to approve such a SIP revision for Massachusetts, but no final decision has been made. EPA is already working with other states interested in adopting RVP controls more restrictive than those EPA is promulgating today.

54 Fed.Reg. at 11882 (VIII. *Interaction With State Volatility Requirements*).

So as to place the foregoing in perspective, prior to the adoption of 40 C.F.R. § 80.1(b), and of course prior to the promulgation of the new amendments regarding gasoline volatility, the Second Circuit in *Exxon Corporation v. City of New York*, 548 F.2d 1088 (1977) held that the then-existing federal regulatory scheme—consisting primarily of what has been renumbered as 42 U.S.C. § 7545(c)(4) and of 40 C.F.R. § 80.1(a)—preempted City regulations regarding gasoline volatility even though no gasoline volatility regulations had been promulgated by the EPA essentially because the City had "imposed controls or prohibitions [which were not] 'identical' to the prohibitions or controls prescribed by the Administrator [and which were therefore impermissibly] more onerous than th[ose] provided by the Administrator." 548 F.2d at 1095; *see also id.* at 1096.

### D. *The New York State Rulemaking*

In November 1987 after the EPA first proposed the current gasoline volatility regulations in August 1987, the heads of the air emission regulatory agencies of eight northeastern states (including DEC Commissioner Jorling) entered into an agreement under the auspices of the Northeast States For Coordinated Air Use Management (NESCAUM) in which each promised to "propose a gasoline volatility control program" pursuant to which, "[b]eginning in 1989 and for each year thereafter, [each] state[] [would] prohibit the sale of gasoline with an RVP greater than 9.0 psi between May 1 and September 15 of each year," the imposition of the 9.0 psi RVP standard marking the "return[] to a level ... which the petroleum industry adhered to voluntarily during the 1970s." NESCAUM Memorandum of Understanding, Plaintiff's Exh 5. Thereafter, on June 15, 1988, the DEC published in the New York State Register a Notice of Hearing regarding a proposed rule to restrict permissible summertime RVPs in New York State to 9.0 psi. Hearings were held on this proposal during the first week of August 1988; API participated in these hearings through the New York State Petroleum Council (NYSPC), a division of API, as did a number of API's member companies, among others. The proposed rule prompted comments from some 28 interested parties; many objections were expressed; the DEC provided a written assessment to the public comments its proposal engendered. *See* Assessment of Public Comments, Plaintiff's Exh 2.

Thereafter, the DEC's final RVP Rule, which differed from its initial proposal in certain respects, was approved by the State Environmental Board on October 4, 1988. The rule was filed with the New York Secretary of State on December 6, 1988 and was published in final form in the New York State Register on December 21, 1988. The rule, 6 N.Y.C.R.R. subpart 225-3, which became effective on January 6, 1989, requires implementation of the 9.0 psi RVP limit beginning on May 1, 1989. Specifically, section 225-3.3(a) states that:

> No person shall sell or supply a volatile motor vehicle fuel to a retailer, other merchant, and/or industrial, institutional or commercial user, having a Reid Vapor Pressure greater than 9.0 pounds per square inch as sampled and tested by methods acceptable to the commissioner,

during the period May 1 through September 15 of each year beginning 1989. Certain exceptions relating to fuel unavailability and the inability to supply the New York market with sufficient quantities of gasoline that conforms to the RVP Rule are also provided for. *See* 6 N.Y.C.R.R. § 225–3.5(a) and (c).

On January 5, 1989, the NYSPC requested the DEC to pass on the validity of the newly-promulgated regulations in light of nine objections it was now raising to the final rule; by letter dated February 3, 1989, the DEC responded to NYSPC's request by summarily rejecting each of NYPSC's objections. *See* Plaintiff's Exh 6 (NYSPC's request) and Exh 7 (DEC's response). However, the DEC on its own initiative had at that time begun to request information from API members and others active in the petroleum business regarding supply issues fundamental to the viability of the RVP Rule. *See* DEC's inquiry to Mobil Oil Corporation, Plaintiff's Exh 8. The DEC concurrently invited various suppliers of gasoline in New York State to meet with it to discuss, among other things, the availability of adequate supplies of qualifying RVP gasoline to meet expected demand during the summer of 1989. In late February 1989, the DEC stated that it would not grant exceptions to individual suppliers under the RVP Rule.

### E. *Pending Litigation and Subsequent Events*

On February 28, 1989, API commenced the present action, seeking declaratory and injunctive relief, challenging the DEC's RVP Rule on the grounds that it was invalid under the Supremacy and the Commerce Clauses of the federal Constitution and additionally that it was invalid for various reasons under State law. Soon thereafter, API moved, by order to show cause, for preliminary injunctive relief.

On March 2, 1989 (two months after the effective date of the RVP Rule and two months before the initial implementation date), the DEC held a public hearing to permit the introduction into the administrative record of testimony on the gasoline

supply availability and to consider a one-month blanket deferral of the deadline for gasoline with an RVP of 9.0 psi. *See* DEC's Notice of Hearing, Plaintiff's Exh 9 [attached to Affidavit of Attorney Michael R. Chayet]. The DEC's administrative record closed on March 6, 1989.

On that same day (March 6), API commenced an article 78 proceeding in State supreme court challenging the adoption of the RVP Rule on grounds arising solely under State law. The parties have stipulated to hold that proceeding in abeyance pending this court's action in the present case.

Since the commencement of this suit, certain events of a highly significant nature have occurred. Briefly stated, these events are as follows. First, the EPA promulgated the gasoline volatility regulations referred to above. Second, on March 22, the EPA published a notice proposing to approve the 9.0 RVP Rule as a revision to New York's State Implementation Plan, comments on which are required to be received by the EPA by April 27, 1989. *See* 54 Fed.Reg. 12656–12659 (March 22, 1989) [Plaintiff's Reply Exh 10]. Third, DEC Commissioner Jorling, on March 28, issued a determination granting "an exception [under section 225–3.5(a)] to postpone implementation of the 9.0 reid vapor pressure (RVP) standard for one month, from May 1, 1989 to June 1, 1989, or until 14 days after the regulation is approved by the [EPA] ... whichever is later." Commissioner's Determination, Defendants' Exh 19.

This last event has proved most troubling with regard to the court's subject matter jurisdiction. Nevertheless, in the court's opinion, Commissioner Jorling's postponement of the implementation date of the RVP Rule has not rendered the parties' dispute moot. Although the court can say "with assurance that 'there is no reasonable expectation,'" *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)), that the State will

change its mind and require that gasoline supplied to the New York market meet the 9.0 psi RVP standard prior to EPA approval, the court cannot say with assurance that there is no reasonable expectation that defendants will not enforce the "economic benefit penalty" required to be paid where, as here, an exception is granted pursuant to 6 N.Y.C.R.R. § 225–3.5(a). *See* 6 N.Y.C.R.R. § 225–3.5(a)(3). Simply stated, the Commissioner's Determination does not address this matter; mootness, therefore, has not been sufficiently demonstrated by defendants so as to divest this court of the power to hear this case and consider the appropriateness of preliminary injunctive relief. *See Davis,* 440 U.S. at 631, 99 S.Ct. at 1383; *W.T. Grant Co.,* 345 U.S. at 632–633, 73 S.Ct. at 897. In the court's opinion, plaintiff, at the very least, still has a legally cognizable interest in a final determination of the underlying questions of law pertaining to the propriety of the DEC enforcing this aspect of the RVP regulation in light of plaintiff's Supremacy Clause challenge to the RVP Rule. *See Davis,* 440 U.S. at 631, 99 S.Ct. at 1383. Imposing the "economic benefit penalty" under 6 N.Y.C.R.R. § 225–3.5(a)(3) would, in effect, constitute enforcement of the 9.0 psi RVP standard, a standard which has not yet been approved by the EPA. The court notes, however, that the unlikelihood that the DEC will require that gasoline supplied to the New York market meet the 9.0 psi RVP standard prior to EPA approval and the absence of any comment by the DEC with regard to enforcement of the "economic benefit penalty" certainly has bearing on the appropriateness of injunctive relief. *See W.T. Grant Co.,* 345 U.S. at 633, 73 S.Ct. at 897.

Having determined that the present controversy is not moot, the court will turn to a discussion of plaintiff's motion for a preliminary injunction essentially barring defendants from enforcing any portion of the RVP Rule. *See* Plaintiff's Reply Memorandum at 7–8 for the injunctive relief requested in light of the recent events.

## DISCUSSION

In order to succeed on a motion for a preliminary injunction, the moving party must establish:

(a) that it will suffer irreparable injury if the injunction is not issued and

(b) either

(1) a likelihood of success on the merits or

(2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor.

*Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975); *Eng v. Smith,* 849 F.2d 80, 81–82 (2d Cir.1988); *Charles of the Ritz Group Ltd. v. Quality King Distributors, Inc.,* 832 F.2d 1317, 1320 (2d Cir.1987); *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir.1985); *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam). Plaintiff contends, of course, that application of the foregoing standard compels the conclusion that preliminary injunctive relief in its favor is strongly warranted. Notwithstanding the court's view at this point in time that enforcement of any portion of the RVP Rule in the absence of EPA approval would be barred under the Supremacy Clause, the court believes that plaintiff is simply not entitled to the extraordinary relief sought: plaintiff has failed to establish that its members are likely to suffer irreparable injury if an injunction is not issued.

### A. Merits

Under the first alternative, a movant, seeking to preserve the status quo, "need not show that success is an absolute certainty[; rather, the movant] need only make a showing that the probability of his prevailing is better than fifty percent." *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985), *quoted in Eng v. Smith,* 849 F.2d at 82. Where, however, a preliminary injunction would not merely preserve the status quo but would grant substantially all the relief the moving party ultimately seeks, the moving party must meet a more stringent standard—it "must show a substantial likelihood of success on the mer-

its." *Eng,* 849 F.2d at 82 (quoting *Abdul Wali,* 754 F.2d at 1026). In the present case, the court believes that preliminary injunctive relief, if granted, would serve to maintain the status quo; the more stringent standard, therefore, is not technically applicable.

### 1. Federal preemption

■■■ Determining whether Congress has exercised its power under the Supremacy Clause of Article VI of the Constitution to preempt state law requires a court to examine congressional intent. *Northwest Central Pipeline Corporation v. State Corporation Commission of Kansas,* — U.S. ——, ——, 109 S.Ct. 1262, 1273, 103 L.Ed.2d 509, (1989). The intent of Congress to preempt local law must be clearly manifested, as federal supremacy may not be lightly presumed. *New York State Department of Social Services v. Dublino,* 413 U.S. 405, 413, 93 S.Ct. 2507, 2513, 37 L.Ed.2d 688 (1973). As the Court in *Northwest Central Pipeline* stated,

> In the absence of explicit statutory language signaling an intent to pre-empt, we infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for States to supplement federal law, *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218 [67 S.Ct. 1146, 91 L.Ed. 1447] (1947), or where the state law at issue conflicts with federal law, either because it is impossible to comply with both, *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143 [83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248] (1963), or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives, *Hines v. Davidowitz,* 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941).

— U.S. at ——, 109 S.Ct. at 1273. The present case, however, is not one in which the court is being asked to infer preemption solely on the ground that Congress has legislated in the same area as the State of New York; rather, the present case is one in which the court is being asked to determine the effect of explicit preemption language appearing in the Clean Air Act. *See*

*Exxon Corp. v. City of New York,* 548 F.2d 1088, 1091 (2d Cir.1977).

■■ In view of the EPA's recent adoption of regulations squarely pertaining to RVP levels for motor vehicle gasoline for use in various parts of the country during the months of May through September, the conclusion seems inescapable that the non-identical and more restrictive State regulations cannot survive the clear preemption language of 42 U.S.C. § 7545(c)(4)(A). Given these new federal regulations, the Second Circuit's decision in *Exxon Corp.* applies even more forcefully. Additionally, the legislative history of the 1970 Amendments to the Clean Air Act supports the conclusion that the federal scheme has preempted the non-identical and more restrictive DEC regulations. The Conference Report states as follows:

> No State may prescribe or enforce controls or prohibitions respecting any fuel or additive unless they are identical to those prescribed by the Federal Government or unless a State implementation plan under sec. 110 [now 42 U.S.C. § 7545(c)(4)(C)] includes provision for fuel or additive control and such plan is approved as being necessary for achievement of national air quality standards.

Conf.Rep. 91–1783, 91st Cong., 2d Sess., *reprinted in* 3 U.S.Code Cong. & Admin. News, 5356, 5374, 5385 (1970), *quoted in Exxon Corp.,* 548 F.2d at 1094. In sum, it readily appears that New York cannot enforce or attempt to enforce any portion of the RVP Rule consistent with the Supremacy Clause.

New York State has the option under 42 U.S.C. § 7545(c)(4)(C) of seeking the approval of the EPA of an implementation plan containing non-identical and more restrictive gasoline volatility regulations and in fact has done so, as has been noted previously. On January 31, 1989, as supplemented by additional materials on March 13, New York transmitted to the EPA its formal request for EPA approval of a revision of New York's State Implementation Plan to include the DEC's 9.0 psi RVP Rule. *See* Defendants' Exhibits 15, 16 and 17. On February 24, the Regional

EPA office issued a decision stating that "it is proposing to approve a request by New York to revise its State Implementation Plan (SIP)" and commenting that more stringent RVP levels in New York "appear[ed] [to be] 'necessary' to achieve" the national ozone standard. Defendants' Exh 16. Thereafter, on March 22, the Acting Assistant Administrator of the EPA wrote to the DEC to

> inform [it] that this morning I approved for publication a *Federal Register* notice which proposes to approve a revision to New York's SIP. The proposed revision restricts gasoline volatility to a Reid Vapor Pressure of 9.0 psi each year from May 1 through September 15.
>
> The proposed approval notice should appear in the *Federal Register* early next week. We are providing 30 days for public comment on the proposal. After consideration of all the comments, EPA will determine whether or not to grant final approval to the proposed SIP revision.

Defendants' Exh 1. The EPA's notice of proposed approval was published on March 28. *See* 54 Fed.Reg. 12656–12659. (The EPA has also issued proposed approvals of regulations of Massachusetts, Connecticut and Rhode Island seeking to limit the RVP of gasoline to 9.0 psi for the summer months. *See* 54 Fed.Reg. 7794–7796, 11016–11018, and 11018–11020, respectively.) Perhaps in response to the latest developments, defendant Jorling, as noted above, issued a determination granting an exception under the RVP regulation postponing the date of enforcement of the RVP Rule. *See* Defendants' Exh 19.

In view of the foregoing recent developments, defendants attack plaintiff's Supremacy Clause challenge to the DEC Rule by arguing that plaintiff has misread statutory and judicial authority. *See* Defendants' Memorandum at 14. In defendants' opinion, the pertinent statute, 42 U.S.C. § 7545(c)(4)(C), does not preempt New York's RVP Rule; rather, it "specifically *authorizes* regulations of the type challenged by API in this action, when such regulations are contained in a Clean Air Act State Implementation Plan ... approved by EPA." *Id.* (emphasis supplied). Continuing in this vein, defendants argue that "[t]he adoption and submittal to EPA of state fuel regulations suspends the general preemptive language of (c)(4)(A). Preemption arises only upon EPA rejection of the state fuel regulation as 'unnecessary' to attain the national standards." *Id.* at 17.

■ Defendants' argument is without merit; it is at odds with a plain reading of the pertinent statutory provisions and with the legislative history of the 1970 Amendments to the Clean Air Act quoted above. Although it appears to be true that a state is not barred from prescribing divergent regulations as part of an SIP, a state cannot, consistent with the Supremacy Clause, enforce or attempt to enforce any portion of such a rule unless it has been approved by the EPA. Defendants also argue, without success, that plaintiff's preemption claim must fail because there is no threat that New York will enforce its rule in the event the EPA denies approval of the revision to the SIP. What New York may do in the event that the EPA denies approval of the SIP revision is of little concern to the court at this point in time. The fact is that, although hinted at, defendants have not expressly conceded that they cannot now, in advance of EPA approval, enforce any provision of the RVP Rule; moreover, defendants have not eliminated, to the court's satisfaction, as noted in conjunction with the court's discussion of the mootness question, the possibility that the "economic benefit penalty" provision contained in 6 N.Y.C.R.R. § 225–3.5(a) will be enforced as part of the Commissioner's grant of an "exception" postponing enforcement of the 9.0 psi RVP standard. The court notes that imposing such penalties would be tantamount to punishing certain of plaintiff's members for not complying, for reasons acceptable to the DEC, with an RVP standard not yet approved by the EPA.

■ Defendants also argue, alternatively, that the court should suspend this action pending referral of the preemption issue to the EPA for its views under the

doctrine of "primary jurisdiction." The court does not agree. First, the EPA is of the view that given the recent promulgation by it of gasoline volatility regulations State regulation of gasoline volatility is preempted unless such regulation is part of an SIP approved by the EPA. *See, e.g.,* Notice of Proposed Approval of New York's SIP Revision, 54 Fed.Reg. at 12657. Second, the issue of preemption under the Supremacy Clause presents a question of law for the court with respect to which the views of the EPA would not be binding in any event.

In sum, absent EPA approval, it readily appears to the court that New York cannot enforce any portion of its RVP Rule consistent with the Supremacy Clause of the Constitution.

### B. *Irreparable Injury*

▓ Although there may very well be support for the view that the greater the likelihood of success on the merits the lesser the degree of irreparable harm need be shown, *see* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948, at 455 (1973) (Wright & Miller); *208 Cinema, Inc. v. Vergari,* 298 F.Supp. 1175, 1182 (S.D.N.Y.1969), given that the Second Circuit has stated that "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered," *Citibank, N.A. v. Citytrust,* 756 F.2d at 275, it would be a mistake for the court to conclude in a perfunctory fashion that given the likelihood of success on the merits irreparable harm almost inevitably follows, *id.* Regardless, then, of the substantial likelihood of success on the merits of the Supremacy Clause claim, the court must make an explicit finding that plaintiff is likely to suffer irreparable harm. *Id.* (As an aside, and so as to clear up doubts that may exist, the court agrees with plaintiff that it, as a voluntary trade association, possesses the requisite associational standing to seek the declaratory and injunctive relief it claims entitlement to on behalf of its members. *See Pennell v. City of San Jose,* 485 U.S. 1, 108 S.Ct. 849, 854–855, 99 L.Ed.2d 1 (1988); *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). The irreparable harm then is that which will be suffered by API's members.)

▓ In the present case, although plaintiff devotes the bulk of its energy detailing the harm that will befall the general public if the RVP Rule is enforced, plaintiff contends, initially, that its "challenge to the RVP Rule on federal constitutional grounds obviates the need for additional proof of irreparable injury." Plaintiff's Memorandum of Law at 39. In plaintiff's view, enforcement of the RVP Rule, being contrary to both the Supremacy and Commerce Clauses, would constitute irreparable harm per se. *Id.* (relying on *Mitchell v. Cuomo,* 748 F.2d at 808, *Albro v. County of Onondaga,* 627 F.Supp. 1280, 1287 (N.D. N.Y.1986) and 11 Wright & Miller § 2948, at 440).

The court disagrees. With one exception cited by plaintiff, *see United States v. State of Michigan,* 508 F.Supp. 480, 492 (W.D.Mich.1980), *aff'd,* 712 F.2d 242 (6th Cir.1983), the cases the court has reviewed in which this point of view is expressed all involve "personal" constitutional rights (coupled with, for example, some physical harm or loss of liberty, i.e., some tangible harm), to be distinguished from provisions of the Constitution that serve "structural" purposes—i.e., a provision of the Constitution relating to the division of power, say, between the States and the federal government, the violation of which is not necessarily accompanied by any tangible harm. Moreover, even though the district court in *State of Michigan* (granting the United States a preliminary injunction to halt a state court from implementing an order finding an Indian in contempt of court for wilfully violating an order limiting the Indian's fishing rights) noted that irreparable harm would be presumed where the denial of a federal treaty right to fish protected by the Supremacy Clause was involved, 508 F.Supp. at 492, the district court also noted that if the injunctive relief was not granted the Indian would be confined to jail for

thirty days, *id.* The Sixth Circuit, in affirming, simply stated that, "[s]ince the state contempt orders violated the Supremacy Clause of the United States Constitution, the District Court did not err in enjoining their enforcement." 712 F.2d at 244.

In the court's view, the DEC's asserted violation of the Supremacy Clause cannot, without more, serve as the basis for a finding of irreparable harm. Interestingly, although the New York Environmental Conservation Law provides for civil and criminal penalties for violations of DEC regulations, *see* N.Y.Envtl.Conserv.Law §§ 71–2103 (civil liability), 71–2105 (criminal liability) (McKinney 1984 and Supp. 1989), plaintiff does not base its claim of irreparable injury in any way on the possibility of the imposition of such liability, notwithstanding the representation in the affidavit of George D. Madden that, although Mobil has manufactured and shipped a small quantity of gasoline that satisfied the 9.0 psi RVP standard when shipped, Mobil currently plans on manufacturing for distribution to the New York market gasoline that meets the federal 10.5 psi RVP standard. Plaintiff's Reply Exh 8 at ¶ 5; *see also* Affidavit of Jerrold L. Levine, Director for Corporate Studies for Amoco Oil Company, Plaintiff's Reply Exh 9 (stating that Amoco will now focus on satisfying the federal 10.5 psi RVP standard).

In addition to the argument that a constitutional violation constitutes irreparable injury per se, plaintiff claims that irremediable damage to the reputations of its member companies as reliable suppliers of quality gasoline will result from the severe restriction of gasoline supplies in New York State this summer. Plaintiff's Memorandum of Law at 51–52. Plaintiff's memorandum is replete with dire predictions of a gasoline shortfall this summer for the New York area. *See id.* at 41–51; *see also* Reply Memorandum at 28–34. The affidavits of G. William Frick, vice president, general counsel and secretary of API, attorney Charles F. Lettow, Dr. Brian C. Davis, a manager with Sun Refining and Marketing Company, and George D. Madden, a manager with Mobil Oil Corporation, also make such assertions. Additionally, Mr. Frick states that the production of 9.0 RVP gasoline for the New York market will, "[f]or the short term, ... require[ ] refiners to take a number of steps including changing the mode of operation of existing refinery equipment and revising the proportionate amounts of available components of gasoline" and that "the shift from 13.5 RVP gasoline directly to 9.0 RVP gasoline will cause difficulty in managing inventories at loading terminals and bulk plants...."

Frankly, the court is still unimpressed. Addressing these matters in reverse order, nowhere does plaintiff even claim that the immediate production and supply of 9.0 RVP gasoline for the New York market will entail substantial expense which its members cannot conceivably expect to recoup. *See National Tank Truck Carriers, Inc. v. Burke,* 608 F.2d 819, 824 (1st Cir.1979). Perhaps, however, this argument would not get plaintiff very far given the EPA's views on how it expects refiners will comply with the new federal standards. In the Preamble to the amendments to 40 C.F.R. parts 79 and 80, the EPA states as follows:

> As mentioned above, we expect that this first phase of volatility control will not require investment in new refining equipment. Refiners will meet the reduced RVP primarily by not adding as much butane to gasoline and by varying refinery process operating conditions to substitute less volatile gasoline components to replace fuel volume and octane quality. EPA estimates that it will take approximately 70 days for refiners and terminals to comply with today's volatility standards. EPA has determined that it takes an average of 45 days to transport fuel to terminals and "mix down" tankage to the level of standards [citation omitted]. The additional time provided here is available for refiners which may require additional start-up or distribution time. As described in Chapter 4 of the [Final Regulatory Impact Analysis], refiners can begin production of this fuel

with very little preparation time because no capital investments are required. 54 Fed.Reg. at 11869 (IV. Description of Today's Action); *see also id.* at 11879–11880 (VI. Analysis of Economic and Environmental Impacts).

As for plaintiff's claim of irremediable damage to the reputations of its members as reliable suppliers of quality gasoline, there is not, in the court's view, much merit to it. Although it is true that loss of goodwill and damage to reputation can under certain circumstances constitute irreparable injury, *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 588 F.2d 24, 29 (2d Cir.1978) (citing *Interphoto Corp. v. Minolta Corp.*, 417 F.2d 621 (2d Cir.1969)), there is no claim here that the termination of franchise or distributorship relationships is at stake. *See John B. Hull, Inc.*, 588 F.2d at 29. Moreover, the loss of goodwill and damage to reputation (aside from being entirely speculative at this point) would presumably be suffered by all suppliers of gasoline to the New York market; a particular supplier would not unfairly be singled out.

In sum, the court determines that plaintiff has failed to establish that its members are likely to suffer irreparable harm if an injunction is not issued. Much has been made of what appears to be the "public interest" component of this case, that is, of the effects the DEC's rule will have on consumers and on the national interest against increased dependence on foreign sources of petroleum. To be sure, the effect on the public interest that a denial or grant of preliminary injunctive relief will have is a factor to be considered by a court. *See Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); *United States v. City of New Haven*, 447 F.2d 972 (2d Cir.1971); 11 Wright and Miller § 2948, at 457. It appears, however, that, unless a statutory injunction is sought, the public interest component of an applicant's argument in support of a preliminary injunction does not do away with the need to establish irreparable injury. *See Securities & Exchange Comm'n v. Globus International, Ltd.*, 320 F.Supp.

158, 160 (S.D.N.Y.1970); *see also City of New Haven*, 447 F.2d at 974 (United States granted injunction against enforcement of state order given probable success on the merits of its Supremacy Clause claim and irreparable injury to public, on whose behalf the government was prosecuting action). Moreover, there also exist public interest concerns that are diametrically opposed to the concerns expressed by plaintiff: to wit, halting the emission of tons of gasoline vapor into the air, that is, halting continued pollution of our air resources. These public interests concerns voiced by defendants, *see* Defendants' Memorandum at 34–36; Defendants' Exhibits 5 and 6, however, only come into play if plaintiff has established irreparable harm, the issue for the court then becoming how to exercise the court's discretion regarding this form of equitable relief. *See Yakus v. United States*, 321 U.S. at 440–441, 64 S.Ct. at 674–675; *Coca–Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 315 (2d Cir.1982).

## CONCLUSION

In the court's opinion, plaintiff is likely to prevail on its claim, not rendered moot by the issuance of DEC Commissioner Jorling's determination, that the provisions of the RVP Rule are preempted by the express preemption provisions of the federal Clean Air Act particularly given the recent adoption of federal gasoline volatility regulations. Plaintiff, however, has not established that its members are likely to suffer irreparable injury if a preliminary injunction is not issued pending final resolution of this case on the merits. Moreover, given the absence of clear-cut irreparable injury to plaintiff, underscored by the absence of any threats to enforce the 9.0 psi RVP standard or any other provision of the RVP regulation prior to EPA approval, given the March 28 determination of DEC Commissioner Jorling, the possibility that the EPA might approve the DEC regulation certainly weighs in favor of denying the injunctive relief sought.

Accordingly, both defendants' cross motion and plaintiff's motion are denied.

IT IS SO ORDERED.