**EXXON MOBIL CORPORATION,**
Petitioner,

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;** Carol Browner, Administrator of the United States Environmental Protection Agency, Respondents.

No. 99–70945.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 26, 2000.

Filed July 7, 2000.

Craig E. Stewart, San Francisco, California, for the petitioner.

Eileen T. McDonough, Department of Justice, Washington, D.C., for the respondents.

Before: BROWNING, FLETCHER and ALARCON, Circuit Judges.

FLETCHER, Circuit Judge:

The Petitioners challenge the final rule by the Environmental Protection Agency ("EPA") approving oxygenated fuel standards set by the revised Nevada State Implementation Plan ("SIP"). The EPA ruling approved a SIP amendment revising a Clark County, Nevada regulation requir-

ing all gasoline sold in the wintertime to have an oxygen content of at least 3.5 percent. The Petitioners claim that the EPA misconstrued section 211(m) of the Clean Air Act, that the county should not have been allowed to require a minimum oxygen content of more than 2.7 percent and that the county's regulation is preempted under section 211(c)(4) of the Clean Air Act. We affirm the EPA's ruling.

## FACTUAL BACKGROUND

Clark County, Nevada is a serious non-attainment area for carbon monoxide ("CO"). In the wintertime, weather inversions trap the CO emissions in the Las Vegas Valley and substantially worsen the region's non-attainment for CO. In 1988, Clark County began an oxygenated fuel program in the wintertime to reduce the level of CO emissions. Initially, the county required all fuel sold to consist of 2.5 percent oxygen with a 2.6 percent level required after the first year of the program. In 1991, the county increased the requirement to 2.7 percent oxygen for wintertime fuel. Nonetheless, Clark County remained a non-attainment area for CO emissions. During the winters of 1994–95 and 1995–96, retailers in Clark County voluntarily decided to sell only gasoline with an oxygen content of 3.5 percent. In September of 1997, the county amended its plan to require a 3.5 percent minimum oxygen content for wintertime gasoline sold between October 1 and March 31.

In August 1998, the state of Nevada submitted Clark County's 1997 oxygenated fuel regulations to the EPA for approval as a SIP revision. The EPA proposed a rule approving the revision and the EPA received only one comment on the proposed rule, from the Western States Petroleum Association ("WSPA"). The WSPA argued that the states were barred from adopting a minimum oxygen requirement other than 2.7 percent. The EPA re-

sponded to this argument in its final rule, issued June 2, 1999.

The EPA's final rule explained that the Clean Air Act compelled the states in non-attainment areas to require that gasoline contain a minimum oxygen level of 2.7 percent but allowed the states to choose a higher minimum oxygen content. The EPA pointed out that neither the text of the statute nor the legislative history demonstrated that Congress intended to prevent the states from adopting higher requirements and that such a prohibition would conflict with the general structure of the Clean Air Act by limiting the ability of states to meet the National Ambient Air Quality Standards ("NAAQS"). Following the issuance of this final rule, Chevron U.S.A. Inc., Exxon Mobil Corporation and Mobil Oil Corporation brought this action seeking review of the EPA's determination.[1]

## ANALYSIS

We have jurisdiction to review the EPA's action under 42 U.S.C. § 7607(b)(1). In reviewing a final action by the EPA, we reverse only if it is arbitrary, capricious, or contrary to law or if it exceeds the statutory jurisdiction, authority, or limitations. *Abramowitz v. United States Environmental Protection Agency,* 832 F.2d 1071, 1074–75 (9th Cir.1987). In reviewing an agency's interpretation of a statute which it administers, we ask whether the intent of Congress is clear and, if not, whether the agency's construction is permissible. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

### I. INTERPRETING THE 1990 AMENDMENTS TO THE CLEAN AIR ACT

The key question is whether the EPA's approval of the Clark County regu-

---

1. Exxon Corporation and Mobil Oil corporation merged to form the Exxon Mobil Corpo-

ration.

lations was a permissible construction of the Clean Air Act. The petitioners claim that the 1990 amendments to the Act adopted a nationwide minimum oxygenated fuel content of 2.7 percent for non-attainment areas and that the statute does not give states the authority to adopt a higher minimum.

■ The "starting point for interpreting a statute is the language of the statute itself." *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). The Clean Air Act, as amended in 1990, sets out oxygenated gasoline requirement for CO non-attainment areas in section 7545:

> Each plan revision under this subsection shall contain provisions to require that any gasoline sold, or dispensed, to the ultimate consumer in the carbon monoxide non-attainment area or sold or dispensed directly or indirectly by fuel refiners or marketers to persons who sell or dispense to ultimate consumers, in the larger of-
>
> (A) the Consolidated Metropolitan Statistical Area (CMSA) in which the area is located, or
>
> (B) if the area is not located in a CMSA, the Metropolitan Statistical Area in which the area is located,
>
> be blended, during the portion of the year in which the area is prone to high ambient concentrations of carbon monoxide to contain not less than 2.7 percent oxygen by weight (subject to a testing tolerance established by the Administrator). The portion of the year in which the area is prone to high ambient concentrations of carbon monoxide shall be as determined by the Administrator, but shall not be less than 4 months.

42 U.S.C. § 7545(m)(B)(2)

In its final rule, the EPA interpreted this section of the statute to create a floor but not a ceiling for non-attainment areas in terms of the oxygen content of gasoline: "the better reading of section 211(m)(2) is that, at a minimum, states must require that gasoline contain 2.7% oxygen by weight, and that states could satisfy this by requiring gasoline to contain 2.7% oxygen or by setting any higher requirement such as 3.1% oxygen content, or 3.5% oxygen content." 64 F.R. 29753, 29574 (June 2, 1999).

■ In interpreting the intent of Congress it is essential to consider the statute as a whole. *See King v. St. Vincent's Hospital,* 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991); *Fort Ord Toxics Project, Inc. v. California Environmental Protection Agency,* 189 F.3d 828, 832 (9th Cir.1999). The Petitioners argue that the placement of the oxygenated fuel requirement in the statute's comprehensive scheme for federal regulation of fuel and fuel additives makes it less likely that Congress intended to give the states flexibility in this matter. The Petitioners also point to the waiver provision of section 211(m)(3), which allowed states to permit oxygen requirements lower than 2.7 percent, as evidence that Congress did not intend to allow a higher minimum.

■ In addition, the Petitioners argue that the EPA's interpretation does not take into account the credit provisions of section 211(m)(5), which they claim will be eviscerated if states are allowed to adopt higher oxygen standards for gasoline. Finally, the Petitioners claim that the fact that section 211(m)(7) of the Act requires states to adopt a 3.1 percent minimum oxygenated gasoline standard in serious non-attainment areas for CO by a certain date is evidence that Congress did not intend the states to adopt higher minimum requirements. Petitioners have waived their right to judicial review of these final two arguments as they were not made before the administrative agency, in the comment to the proposed rule, and there are no exceptional circumstances warranting review. *See Johnson v. Director, Office of Workers' Compensation Programs,* 183 F.3d 1169, 1171 (9th Cir.1999).

As to the remaining claims, the overall scheme of section 211 relies on the states,

through the State Implementation Plans ("SIPs") to regulate oxygenated fuel. Section 211(m) is unique among the provisions of section 211 in that it invokes state rather than federal authority to regulate gasoline. States are required to revise their SIPs to incorporate oxygenated fuel regulations designed to meet the NAAQS. Section 7410 of the Clean Air Act states that any "state may revise an applicable implementation plan approved under this subsection to suspend or revoke any such program included in such plan, provided that such plan meets the requirements of this section." The Supreme Court, in interpreting the mandate of the SIP requirements, determined that Congress did not limit state authority to regulate pollution. *Union Electric Co. v. EPA,* 427 U.S. 246, 265, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976). Finally, the waiver provisions in section 211(m)(3) have no bearing on the proper interpretation of 211(m)(2) because the concern of maintaining an adequate supply of oxygenated fuel is not affected by whether the oxygen level is 2.7 percent or 3.5 percent.

 The Clean Air Act also contains another provision regarding oxygenated fuel which allows for such minimum oxygen content as is necessary for the attainment of the NAAQS. Two statutory sections which overlap should be construed consistently. *Department of Revenue of Oregon v. ACF Industries, Inc.,* 510 U.S. 332, 340–41, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994). Statutory constructions which render other provisions superfluous are disfavored. *Hohn v. United States,* 524 U.S. 236, 249, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998). The provision, entitled "Serious Areas: Oxygenated Gasoline," states that:

Within 2 years after November 15, 1990, the State shall submit a revision to require that gasoline sold, supplied, offered for sale or supply, dispensed, transported or introduced into commerce in the larger of-

(i) the Consolidated Metropolitan Statistical Area (as defined by the United States Office of Management and Bud-

get)(CMSA) in which the area is located, or

(ii) if the area is not located in a CMSA, the Metropolitan Statistical Area (as defined by the United States Office of Management and Budget) in which the area is located,

be blended, during the portion of the year in which the area is prone to high ambient concentrations of carbon monoxide (as determined by the Administrator), with fuels containing such level of oxygen as is necessary, in combination with other measures, to provide for attainment of the carbon monoxide national ambient air quality standard by the applicable attainment date and maintenance of the national ambient air quality standard thereafter in the area.

42 U.S.C. § 7512a(b)(3)(A)

Although this provision is precise in defining the geographic scope of the regulation and provides for a fixed deadline for attainment, the provision is more flexible in its requirement that fuels contain "such level of oxygen as is necessary ... to provide for attainment of the carbon monoxide national ambient air quality."

 To the extent that the statute is not clear, we look to see if the agency's construction is permissible. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. We "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. 2778. The Court in *Chevron* recognized that the Clean Air Act continued to "assign 'primary responsibility for assuring air quality'" to the states. *Id.* at 846, 104 S.Ct. 2778. Thus, any reasonable agency interpretation of the statute is sufficient absent clear congressional intent. *Id.* at 844, 104 S.Ct. 2778.

The text of the statute at issue here is somewhat ambiguous on the question of whether the 2.7 percent oxygenate stan-

dard is a national minimum, which the states may go beyond, or whether that minimum precludes the states from such action. The key section mandates revisions to the state SIPs for serious non-attainment areas for CO so that these SIPs "contain provisions to require that any gasoline sold … contain not less than 2.7 percent oxygen by weight." It is not obvious from this text whether Congress intended to require that a specific 2.7 percent minimum be adopted or that a minimum "not less than" 2.7 percent be adopted. No unambiguous congressional intent can be discerned from reading this particular provision alone.

However, in the context of the statute as a whole and related provisions, it appears that the states retain the authority to require a minimum oxygenate standard greater than 2.7 percent under the Act. The structure of environmental regulation under the Act relies on state enforcement based on SIPs and the oxygenate fuel mandate is to be implemented through this SIP process. More importantly, the companion provision to the one at issue here mandates states to revise their SIPs to require gasoline sold "containing such level of oxygen as is necessary, in combination with other measures, to provide for attainment of carbon monoxide national ambient air quality standard by the applicable attainment date." Although the statutory structure and these related provisions do not entirely resolve the ambiguity, they are sufficiently persuasive evidence that the EPA's final rule was a reasonable construction of the statute and should therefore be entitled to *Chevron* deference based on the text and structure of the statute.

■ To the extent that the text of the statute is not clear, it is necessary to investigate the legislative history to discover the intent of Congress. *United States v. Daas,* 198 F.3d 1167, 1174 (9th Cir.1999). Since the provisions at issue here were adopted on the floor of the House and incorporated in the Senate version at conference there are significant gaps in the legislative history. There are no committee reports on the provision from either the House or the Senate. However, there are a number of key floor statements as well as conference reports to offer some guidance.

In the Senate, the national minimum oxygenated gasoline requirement for nonattainment areas was originally 3.1 percent. According to the statements of Senator Daschle, the 3.1 percent requirement was included in the bill and supported by the Administration in the version negotiated between the Senate and the Administration. Senate Committee on Public Works, 103d Congress, 1st Sess., A Legislative History of the Clean Air Act Amendments of 1990, Serial No. 103-38, Vol. IV at 5435 (1993) (hereinafter cited as Legislative History).

Senator Lautenberg introduced an amendment on the floor which would have reduced the requirement in the Senate bill from 3.1 percent to 2.7 percent. The level of 2.7 percent was chosen by Lautenberg, in part, to allow for the use of methyl tertiary butyl ether ("MTBE") as well as ethyl alcohol, or ethanol. Legislative History, Vol. II at 1325. As Lautenberg explained: "By setting a minimum oxygen content of fuels during winter months at 2.7 percent, other fuels such as MTBE could be used in non-attainment areas." Legislative History, Vol. IV at 4874. Lautenberg further argued that setting the level at 3.1% took away flexibility from state and local officials. Legislative History, Vol. IV at 5429. Senator Harkin and other senators responded that lowering the oxygenate minimum to 2.7 percent would increase pollution dramatically, as much as 400,000 tons per year. Legislative History, Vol. IV at 5447.

Senator Wirth explained that he understood the Lautenberg amendment to retain flexibility for the states to impose higher standards:

As I understand it, the amendment offered by the Senator from New Jersey would not set this issue in concrete. It

would require that oxygenated fuels sold in these non-attainment areas contain 2.7 percent oxygen. If, a few years down the road it makes sense for a State or a city like Denver, to set a higher minimum oxygen content, that possibility always exists. All we are saying with this amendment is that we don't want to set a national minimum oxygen content of 3.1 percent.

Legislative History, Vol. IV. at 5457.

The Lautenberg amendment was tabled in the Senate and the Senate bill went to conference with the 3.1 percent requirement. Legislative History, Vol. IV at 5462.

The House of Representatives adopted a 2.7 percent requirement on the floor with the passage of the Richardson–Madigan amendment, which had failed by one vote in committee. Legislative History, Vol. III at 2725. An explanatory document in the legislative history, entitled the Clean Air Facts from May 31, 1989, pointed out that Denver, Albuquerque and Phoenix had all adopted oxygenated fuel programs and that Albuquerque requires a minimum oxygen content of 3.1% but offers retailers 'oxygen credits' to offset sales of low-oxygen fuels. Legislative History, Vol. III at 2517.

Congressman Richardson, of New Mexico, explained that "all 44 carbon monoxide non-attainment cities will be required to sell gasoline containing a minimum oxygen content level of 2.7 percent to reduce carbon monoxide to healthy levels." Legislative History, Vol. III at 2605. Richardson further explained that the "Richardson–Madigan provision does not mandate a 'recipe' or so-called government gas, nor does it mandate ethanol. Instead the amendment establishes minimum basic standards to reduce ozone forming and toxic air pollutants in gasoline." Legislative History, Vol. III at 2694. In addition, Richardson stated that those "serious CO areas that fail to reduce CO to acceptable levels by the deadline would be required to sell oxygenated fuels containing 3.1 per-

cent oxygen." Legislative History, Vol. III at 2694.

The "Chafee–Baucus Statement of Senate Managers of S. 1630, the Clean Air Act Amendments," offered some explanation of the changes adopted in the House–Senate Conference for the oxygenated fuel provisions in subsection 211(m):

Conference Agreement: The conference agreement requires any gasoline sold in a carbon monoxide non-attainment area to contain at least 207[sic] percent oxygen during the portion of the year in which the area is prone to high carbon monoxide levels. The area is defined for purposes of this requirement as the M.S.A. or consolidated MSA, whichever is larger.

The Administrator may waive the oxygenated fuels requirement in whole or in part if the State can demonstrate to the satisfaction of EPA that the use of oxygenated fuels would prevent or interfere with the attainment by the area of a pollutant other than carbon monoxide, if the State can demonstrate that mobile sources do not contribute significantly to carbon monoxide levels in the area, or if there is an inadequate domestic supply or distribution capacity for the product. Serious areas which fail to achieve the air quality standard by the applicable attainment date are required to switch to a fuel with 3.1 percent oxygen unless the requirement is waived by the EPA.

Legislative History, Vol. II at 895.

The intentions of the managers at the House–Senate Conference are reflected in the Joint Explanatory Statement of the Committee of the Conference. The section on reformulated gasoline explains that:

The agreement establishes an oxygen content level of 2.7 percent in 44 cities with carbon monoxide pollution, starting in 1992. These provisions will encourage the use of oxygen-containing additives like ethanol and MTBE, a natural gas derivative.

A number of Senators explained that the 1990 amendments preserved the authority of the states to regulate air pollution. Senator Burdick explained that "the bill does not affect existing States' rights.... This statement parallels the statement in section 116 of the Clean Air Act that 'nothing in this act shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants.'" Legislative History, Vol. II at 782. Senator Leahy commented on the bill that "it guarantees States the right to implement the strongest laws that are necessary to protect the environment and health of its citizens." Legislative History, Vol. IV at 5582.

Especially revealing is the colloquy which Senator Kohl of Wisconsin had with one of the bill managers, Senator Baucus. Senator Kohl stated:

> I want to be very clear. Current law allows a 'state to prescribe and enforce ... a control ... respecting the use of a fuel or fuel additive' for automobiles. If a State needs to adopt an RVP standard that is more rigorous than the Federal requirement for fuel additives or fuels they have that authority under current law. That authority is maintained in the legislation we are now considering. Is my understanding correct?

Legislative History, Volume IV at 6125.

Senator Baucus replied that "The Senators from Wisconsin are both correct. Wisconsin will be able to regulate fuels and fuel additives under the SIP. The Administrator of the Environmental Protection Agency shall allow this State action if he or she finds the State control is necessary to meet national primary or secondary air quality standards." Legislative History, Vol. IV at 6125.

The legislative history of the adoption of the oxygenated fuel standards, although it does not resolve all ambiguities, does support the conclusion that the EPA's construction of the statute was reasonable and should be entitled to *Chevron* deference. The legislative history suggests that fuel neutrality on the part of the Administrator was a goal of the provisions but all the references to state authority support the determination that state authority to regulate oxygenate levels was not thereby limited.

Senator Wirth's unchallenged explanation of the implications of Lautenberg's amendment is the only explicit reference to the authority of the states to require oxygen levels that exceed the oxygenate minimum. Wirth's statement left no doubt that the states had the authority to go beyond the national 2.7 percent minimum. This conclusion is further bolstered by the fact, incorporated in the legislative history on the House side, that Albuquerque already had a minimum oxygen content requirement of 3.1%. Especially significant are the statements by a number of Senators, including the bill managers, explaining that the 1990 amendments maintained state authority to adopt and enforce the strongest standards to prevent air pollution. The legislative history, as well as the text of the statute, demonstrate that the EPA's construction of the statute was reasonable.

## II. PREEMPTION ANALYSIS

██ The next question is whether Clark County's oxygen standard, even if permitted under section 211(m) of the Clean Air Act, is preempted under section 211(c)(4)(A) of the Act.

Section 211(c)(4)(A) of the Clean Air Act states that:

> [N]o State (or political subdivision thereof) may prescribe or attempt to enforce, for purposes of motor vehicle emission control, any control or prohibition respecting any characteristic or component of a fuel or fuel additive in a motor vehicle or motor vehicle engine—
>
> (i) if the Administrator has found that no control or prohibition of the characteristic or component of a fuel or fuel additive under paragraph (1) is necessary and has published his finding in the Federal Register, or

(ii) if the Administrator has prescribed under paragraph (1) a control or prohibition applicable to such characteristic or component of a fuel or fuel additive, unless State prohibition or control is identical to the prohibition or control prescribed by the Administrator.

42 U.S.C. § 7545(c)(4)(A).

However, the statute permits exceptions to this preemption when the state has been granted a waiver under section 209 or when the EPA has determined that the state regulation at issue is necessary to achieve an air quality standard.

The Petitioners claim that Clark County's regulation is preempted because the EPA has promulgated regulations for reformulated gasoline applicable to the oxygen content of gasoline and the county's regulation is not identical to the EPA's regulations. Specifically, the Petitioners point to the EPA's regulation that the oxygen content of gasoline must be at least 2.0 percent by weight on a per gallon basis and 2.1 percent on an averaged basis. *See* 40 C.F.R. § 80.41. In addition, Petitioners cite the EPA's regulation of oxygenates in conventional gasoline as preempting Clark County's regulation. *See* 40 C.F.R. § 80.101(c)(2).

The EPA concluded that section 211(c)(4) did not prevent the states from using regulatory authority which was expressly provided in another statutory provision. This section, the EPA concluded, restricts the states' authority to adopt a fuel control or prohibition for any characteristic which the EPA has regulated under section 211(c)(1), which reads:

The Administrator may, from time to time on the basis of information obtained under subsection (b) of this section or other information available to him, by regulation, control or prohibit the manufacture, introduction into commerce, offering for sale, or sale of any fuel or fuel additive for use in a motor vehicle, motor vehicle engine, or nonroad engine or nonroad vehicle (A) if in the judgment of the Administrator any emission product of such fuel or fuel additive causes, or contributes, to air pollution which may reasonably be anticipated to endanger the public health or welfare, or (B) if emission products of such fuel or fuel additive will impair to a significant degree the performance of any emission control device or system which is in general use, or which the Administrator finds has been developed to a point where in a reasonable time it would be in general use were such regulation to be promulgated.

42 U.S.C. 7545(c)(1)

The text of the Clean Air Act, in a number of different sections, explicitly protects the authority of the states to regulate air pollution. The Supreme Court has given substantial weight in preemption analysis to evidence that Congress intended to preserve the states regulatory authority: "Just as courts may not find measures preempted in the absence of clear evidence that Congress so intended, so must they give full effect to evidence that Congress considered, and sought to preserve, the States' coordinate regulatory role in our federal scheme." *California v. Federal Energy Regulatory Commission,* 495 U.S. 490, 497, 110 S.Ct. 2024, 109 L.Ed.2d 474 (1990).

The first section of the Clean Air Act, entitled "Congressional Findings," makes clear that the states retain the leading role in regulating matters of health and air quality: "air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3).

In the section of the Clean Air Act focused on SIPs, the primary responsibility of the states is again reaffirmed: "Each state shall have primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary

ambient air quality standards will be achieved and maintained within each air quality control region in such State." 42 U.S.C. § 7407(a).

The Clean Air Act also includes a sweeping and explicit provision entitled the "Retention of State Authority." This section provides that, with the exception of aircraft emissions, standards for new motor vehicles and the aforementioned section regarding the prohibition of fuel additives, "nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution." 42 U.S.C. § 7416.

In preemption analysis, the Supreme Court is highly deferential to state law in areas traditionally regulated by the states. *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Company*, 514 U.S. 645, 654–55, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). The Court held, in *Travelers*, that:

> we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law ... [I]n cases like this one, where federal law is said to bar state action in fields of traditional state regulation ... we have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'

*Id.* (internal citations omitted)

■ Air pollution prevention falls under the broad police powers of the states, which include the power to protect the health of citizens in the state. Environmental regulation traditionally has been a matter of state authority. *See Massachusetts v. United States Department of Transportation*, 93 F.3d 890, 894 (D.C.Cir. 1996). The Supreme Court, in *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), clearly directed that preemption analysis begin from the presumption that such local police powers are not preempted: "Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens. Because these are 'primarily, ... matter[s] of local concern,' the 'States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" *Id.* (internal citations omitted).

In other contexts, the Supreme Court has held that: "the States may submit implementation plans more stringent than federal law requires and that the Administrator must approve such plans if they meet the minimum requirements of [section] 110(a)(2)." *Union Electric Co.*, 427 U.S. at 265, 96 S.Ct. 2518. In addition, the Court has held that the Clean Air Act "explicitly preserved the principle: 'Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State.'" *Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 64, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

■ In discerning congressional intent in preemption analysis, the Supreme Court has made clear that the objectives and purpose of a statute, as well as the text, are critical to preemption analysis. *Travelers*, 514 U.S. at 654, 115 S.Ct. 1671. The "statutory framework" surrounding a provision as well as the "structure and purpose of the statute as a whole" are relevant to analyzing the scope of preemption. *Medtronic*, 518 U.S. at 486, 116 S.Ct. 2240.

■ The overriding purpose of the Clean Air Act is to force the states to do their job in regulating air pollution effectively so as to achieve baseline air quality standards, the NAAQS. The primary mechanism for achieving the NAAQS are through the local and state planning process which create the SIPs. When states

fail to achieve the NAAQS they face a variety of penalties, including the threat that the federal government will intervene and impose its own plan. Thus, states have both the responsibility and the enhanced incentive to meet the NAAQS. The oxygenated gasoline provision is focused only on serious non-attainment areas for CO in order to help bring these areas into compliance with the NAAQS. The preemption provision at issue focuses on the Administrator's regulation and prohibition of gasoline additives but does not mention the oxygenate level in gasoline.

Since a state might need to raise the oxygenate level in gasoline to reduce CO emissions and meet the NAAQS, a core purpose of the Act, the preemption provision in section 211(c)(4)(A) of the Act would go against the overall statutory purpose if it was construed to prohibit the state from exceeding national minimum oxygenate standards established in the Act. The Petitioners implicitly recognize that this provision does not preempt any state regulation of the oxygenate level in their initial argument that 211(m)(2), a different section of the Act, defines the boundaries of permissible state regulation.

Finally, the petitioners argue that a Second Circuit holding, in *Exxon Corp. v. City of New York*, 548 F.2d 1088 (2d Cir.1977), strongly supports a finding of preemption in this case. However, in that case New York City set local standards regulating the lead content and volatility of gasoline sold in the city but these standards were neither authorized by provisions of the Clean Air Act nor approved by the EPA Administrator. *Id.* at 1094. In fact, the Second Circuit noted that it was "the unusual case where explicit preemption language appears in the Act" and that this language explicitly preempted state and local regulations "unless such control or prohibition is identical with the federally promulgated standards." *Id.* at 1095. In contrast with New York's regulation of lead, oxygenated gasoline was mandated by the 1990 Amendments and Clark County's minimum standard was approved by the Administrator.

As regulating air pollution falls under the historic police powers of the states, the authority of the states is assumed not to have been preempted unless it was the clear and manifest purpose of Congress to do so. The statutory preemption provisions at issue here focus on the regulation and prohibition of fuel additives rather than oxygenate standards and, therefore, do not demonstrate such a clear and manifest purpose to preempt state regulation of oxygenate levels. This conclusion is bolstered by the express requirement that the states mandate minimum oxygen content for fuel in CO non-attainment areas in order to meet the NAAQS and fulfill the purpose of the Clean Air Act.

We conclude that the EPA's approval of Nevada's revised SIP that adopts Clark County's requirement that gasoline sold in Clark County in the months October through March contain at least 3.5 percent oxygen content by weight, does not conflict with, and is not preempted by any provision of the Clean Air Act. Therefore, we affirm the EPA's final ruling.

AFFIRMED.